Argued March 21, reversed and remanded June 1, reconsideration denied
July 13, petition for review denied October 25, 1977

## STATE OF OREGON, *Appellant,*
*v.*
## GLENN FREDERICK KOENNECKE, *Respondent.*
### (No. 96670, CA 7028)

565 P2d 376

Kevin L. Mannix, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were James A. Redden, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Dwight L. Schwab, Portland, argued the cause for respondent. With him on the brief were Schwab, Burdick & Hilton and James C. Niedermeyer, Portland.

Before Schwab, Chief Judge, and Lee and Richardson, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Defendant was indicted on September 28, 1973, for attempted murder of Donald Weber, a police officer, by "firing a high powered rifle at the said Donald M. Weber from close range." On motion of defendant the court dismissed the indictment on the ground certain evidence material to his defense was lost or destroyed in violation of his constitutional rights as set out in *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963). The state appeals.

This case has not yet gone to trial. The record on appeal includes a transcript of the hearing on the motion to dismiss and the exhibits received in that hearing. These exhibits include the transcript of the preliminary hearing.

The events which produced the indictment occurred on March 18, 1973. A police officer attempted to stop defendant for speeding. The officer followed defendant's car in a high-speed chase to his home where defendant, after a short altercation with the officer, ran into his house. Shortly thereafter additional police officers arrived and stationed their vehicles across the front of defendant's property and crouched behind the patrol cars. Two women, the defendant's wife and a baby-sitter, left the residence, got into defendant's car, which was parked in the driveway, and attempted to drive away. The police stopped them and ordered them out of the car. As they left the car and walked toward the police vehicles the police heard what they identified as a rifle shot which appeared to come from a short distance away in the general area of defendant's house in back of his vehicle. This was followed, within a few seconds, by a second rifle shot from the same area.

Officer Inhofer testified at the preliminary hearing he heard both rifle shots, that instantaneously with hearing the second rifle shot he saw the window of the left rear door of the police vehicle shatter and saw what he described as a bullet hole in the lower right

corner of the windshield. This bullet hole had not been in the windshield between the first and second rifle shots. He was crouched behind the left front of this vehicle aiming his weapon across the hood.

After the second rifle shot and the shattering of the rear door glass, Officer Inhofer fired two shots toward the area from where the rifle shots were fired. The alleged victim, Officer Weber, was crouched near the left rear door of the police vehicle that was struck by a bullet. He testified he did not hear the shattering of the car window and that after the two rifle shots he heard three other shots which he thought came in quick succession.

Approximately ten minutes after Officer Inhofer fired his revolver, the fifth and final shot was fired by Officer Nielson. Officer Nielson had arrived on the scene, in the company of another officer, shortly after the rifle shots were fired. The other officer saw defendant, whom he recognized, crouched behind the defendant's vehicle with a rifle pointed toward the other police cars. Officer Nielson shined his flashlight on defendant and ordered him to drop the rifle. When defendant aimed the rifle at Nielson, Nielson fired one shot at the defendant who did not fire but ran into a wooded area.

Testimony at the preliminary hearing disclosed only five shots were fired; two from a rifle and three from police pistols. It was stipulated at the hearing on the motion to dismiss that only Officers Inhofer and Nielson fired and that they used .357 magnum pistols. The police subsequently located a 30-30 Winchester rifle at defendant's place of business near his home.

A subsequent examination of the patrol car disclosed a bullet fragment inside the front seat, a bullet fragment in the left rear door and minute fragments in the vinyl upholstery of the door around a small jagged hole. The fragments found in the car comprised less than ten percent of the total weight of a 30-30 caliber bullet. No other bullet fragments were found.

[ 640 ]

It was the state's theory the bullet fragmented as it entered the windshield with one fragment hitting the left rear door panel and a larger fragment going through the left rear door glass.

The entire left rear door was removed and examined by the Oregon State Police Crime laboratory. The state criminologist removed the upholstery panel and cut away a rectangular portion of the vinyl upholstery and padding surrounding the hole. This revealed a metal plate which is an integral part of the upholstery panel. This plate contained an indentation with a perforation at the bottom. It is this metal plate, which the state subsequently lost or destroyed, which is the basis of the defendant's motion to dismiss.

The door was replaced on the vehicle with a different upholstery panel including a different integral metal plate. The patrol car was returned to service and subsequently sold at an auction. The defendant's expert subsequently examined the door but has not seen the upholstery panel and the accompanying metal plate.

The state police criminologist took photographs of the panel and metal plate but did not measure the indentation in the metal plate and conducted no tests to determine the angle of fire, velocity or weight of the projectile which made the dent. He testified, after conducting ballistics tests with the 30-30 rifle and the bullet fragments found in the police car, that there was a "high degree of probability" the fragments were fired through the 30-30 rifle, but these fragments did not contain enough detail for an adequate comparison.

An expert testified on behalf of defendant at the hearing on the motion to dismiss. He stated if he had the metal plate and upholstery panel he could, through comparison tests, determine whether the indentation was made by a projectile from a 30-30 rifle or a .357 magnum handgun. He also stated the bullet fragments were too minute and did not possess enough detail for a useful ballistics analysis and the only way to

determine what type of bullet made the indentation was to examine the plate and conduct comparison tests with the same weapons. It was his opinion the bullet did not shatter upon entering the windshield but continued and struck the door panel where it then fragmented; that the impact of the bullet on the door shattered the glass by the force of the impact.

Defendant makes no claim the metal plate was discoverable under ORS 135.805 et seq, Oregon's discovery statute. His claim is based on due process grounds set out in *Brady v. Maryland, supra.* That case held it was a violation of the constitutional guarantee of due process for the state to suppress evidence which is favorable to the defendant and material to his guilt or his penalty. The United States Supreme Court in *Moore v. Illinois,* 408 US 786, 92 S Ct 2562, 33 L Ed 2d 706, (1972), said the important parts of *Brady* are (1) suppression by the prosecutor after a request for evidence by the defense, (2) the evidence has favorable character for the defense and, (3) the materiality of the evidence.

In the case at bar the defendant obtained an order requiring the state to turn over the entire door for defendant's examination. It is unnecessary to detail the protracted litigation regarding discovery in this case. *See State v. Koennecke,* 22 Or App 89, 537 P2d 1160 (1975) and 274 Or 169, 545 P2d 127 (1976). Suffice it to say the state was negligent in losing the upholstery panel and metal plate. The decision in this case cannot be based on the conduct of the prosecutor. Whether the evidence is missing due to intentional misconduct, inadvertence or guileless mistake the significance to the defendant is the same. The prosecutor does not violate a constitutional duty to disclose unless his omission is of sufficient significance to result in the denial of defendant's right to a fair trial. *United States v. Agurs,* 427 US 97, 96 S Ct 2392, 49 L Ed 2d 342 (1976). If the evidence has the constitutional significance requiring dismissal it must come from the character of the evidence itself and not from

the character of the prosecutor. The principal inquiry then is whether the metal plate was favorable to the defense and material on the issue of guilt or innocence.

■ Defendant has the burden of proof to establish with some particularity the evidence sought will be favorable. *State ex rel Dooley v. Connall,* 257 Or 94, 475 P2d 582 (1970). This burden requires some showing that it could be reasonably anticipated the evidence sought would be exculpatory and material to his defense. *State v. Williams,* 11 Or App 255, 500 P2d 722 (1972). It is not sufficient that the showing disclose merely a hoped for conclusion from examination of the destroyed evidence, nor is it sufficient for the defendant to show only that examination of the evidence would be helpful in preparing his defense. *United States v. Agurs, supra.*

■ In *State v. Michener,* 25 Or App 523, 550 P2d 449, Sup Ct *review denied* (1976), we held the trial court properly suppressed the results of a breathalyzer test because the defendant had demonstrated a meaningful analysis of the destroyed breathalyzer ampules was possible and a reasonable possibility that an error occurred in the initial administration of the test. Consequently, the evidence would have been favorable under the test of *Brady.* The implication of *Michener* is the defendant, when seeking evidence that requires expert analysis, must demonstrate beyond mere speculation that two factors exist. First, that a meaningful analysis could be made of the sought for evidence to produce a conclusion, and secondly, the conclusion would be favorable to the defense. Where the evidence is lost or destroyed the task of the defendant becomes more difficult since he cannot analyze the evidence to determine if his assertion will be borne out. This, however, does not relieve him of the responsibility of making:

> "* * * at least *some* showing, to the extent reasonable under the circumstances of the particular case, to support at least a belief and contention in good faith that the evidence demanded is 'favorable' to defendant and

'material' to his guilt or innocence." *State v. Koennecke, supra,* 274 Or at 179.

Defendant argues since two types of weapons were fired and since an examination of the metal plate could establish whether the bullet came from a rifle or a handgun this would establish whether defendant or the police shot toward the victim. Defendant has adequately demonstrated a meaningful analysis of the door panel could be made. Logically if the expert established the bullet was from the police handgun this would be quite favorable and material to the defense. This contention, however, must be analyzed in terms of the reality of this case. The testimony presented at the preliminary hearing disclosed the first shot from the police officers came after the rear door glass had been shattered. Officer Inhofer, who fired two shots, was crouched behind the left front portion of the police vehicle which was struck by a bullet and was shooting across the hood of that car toward the rear of defendant's car. It was highly unlikely, if not physically impossible, that either of his shots went into the right windshield and struck the left rear door and window of the patrol car. Officer Nielson, who fired the fifth and last shot, fired approximately ten minutes after the two rifle shots and after the police vehicle had been hit. In addition he fired toward the defendant who was standing near the rear of his own car. Here again, because of the time factor and the direction of fire, it is highly unlikely Officer Nielson's bullet struck the police car. In this posture of the facts, examination of the metal plate would be little more than scientific investigation in the abstract.

Defendant's contention simply stated is he wished to examine the door panel to determine which bullet came through the windshield and struck the rear door. This says little more than he is seeking a hoped for result the bullet was from a police handgun. By failing to make some showing that it could be reasonably anticipated the hoped for result would be found he has

failed to meet his burden of showing the metal plate lost or destroyed by the state would be favorable or material to his defense as required by *Brady.* Accordingly it was error to grant the motion to dismiss.

■ A second ground urged by the defendant for dismissal was the denial of a speedy trial. Since the trial court dismissed the indictment on the basis of the destroyed evidence the speedy trial ground was not ruled on. The defendant presented memoranda and affidavits in support of this ground and it was argued by both parties before the trial court. Both the parties likewise have presented arguments in their briefs on this appeal and included the issue in oral argument. Since the lack of speedy trial was urged as an alternative ground for dismissal it is reviewable by this court to determine if it is a proper basis of dismissal.

■ In determining a motion for dismissal on speedy trial grounds courts have identified four factors as the basis of analysis: The length of delay, whether defendant has asserted his right to speedy trial, the reasons for the delay and the prejudice to the defendant. *Barker v. Wingo,* 407 US 514, 92 S Ct 2182, 33 L Ed 2d 101 (1972); *State v. Ivory,* 278 Or 499, 564 P2d 1039 (1977); *State v. Evans,* 19 Or App 345, 527 P2d 731 (1974), Sup Ct *review denied, cert denied,* 423 US 843 (1975). No one of these factors is an exclusive determiner of when the right to speedy trial has been denied. Rather, they are indicators which, when considered in view of their interrelationship and together with other circumstances which may bear on a particular case, are helpful in achieving the sensitive balance between the public's interest in maintaining an efficient and effective judicial process and the accused's interest in a speedy resolution of charges against him. Speedy trial cases do not lend themselves to analysis according to rigid standards, they must rather be approached on an ad hoc basis with the aid of these indicators.

## 1. Length of Delay

■ The length of delay is a triggering mechanism, determining whether further analysis is necessary. *State v. Gray,* 26 Or App 901, 554 P2d 638, Sup Ct *review denied* (1976). In this case four years have passed since the shooting incident on March 18, 1973. This is obviously sufficient to initiate further inquiry of the defendant's claim.

## 2. Defendant's Assertion of his Right

■ Defendant first asserted his right to a speedy trial by a motion to dismiss filed November 21, 1974, the motion was denied December 5, 1974. On January 3, 1975, defendant again filed a motion for dismissal on this ground and additionally on the ground the state had not accorded him proper discovery. The speedy trial motion was continued pending the state's appeal in the first *Koennecke* case. The motion was finally heard in the proceeding which is the basis of this appeal. Thus, the defendant asserted a right to speedy trial as early as November, 1974. Defendant's failure to assert a right to a speedy trial prior to November, 1974, must be weighed against the defendant. Delay in trial is not necessarily inconsistent with a defendant's interests. He may be seeking or even fostering delay as a trial tactic. It is well known a defendant in a criminal case can achieve definite advantages through delay. *See Barker v. Wingo, supra.* Failure to seek a prompt trial or move for dismissal for lack of speedy trial is strong evidence the defendant did not want a prompt trial.

## 3. Reasons for the Delay

It is difficult to assign responsibility for the delay in this case. In summary the principal reason was the protracted litigation involving discovery. Both parties had filed motions for discovery of potential evidence in control of the other. There were numerous hearings on these motions culminating in the two appeals in this case.

The thrust of these motions and their attendant hearings and appeals was to determine the rights of the parties to discovery. Although the court and the state have the responsibility to promptly bring the defendant to trial the proceedings necessary to determine and protect the rights of the parties is a permissible delay in the final resolution of the charge against the defendant. *See Harrison v. United States,* 392 US 219, 88 S Ct 2008, 20 L Ed 2d 1047 (1968); *United States v. Bishton,* 463 F2d 887 (DC Cir 1972). In asserting these rights and asking for judicial determinations of them the defendant must share in responsibility for delay. Defendant contends the delay and his motions were necessary because of the state's refusal to respond to the court's orders respecting discovery. It must be recalled defendant's contentions respecting discovery were determined adversely to him on appeal. In addition some portion of the delay must be attributed solely to the defendant. He refused to enter a plea on the ground it was necessary to complete his analysis of the police officer's weapons and the door panel in order to determine the plea he wished to make. The court entered a plea of not guilty on his behalf on December 9, 1974. The desire for further investigation is not a justification for delay in entering a plea. The defendant can simply enter a plea of not guilty and then continue his investigations. The case cannot proceed to trial until it is at issue by a plea to the indictment.

The mandate on the first appeal was entered in the trial court on March 5, 1976. Defendant then moved for a change of venue from Washington County to Clackamas County. This motion was heard May 16, 1976, and granted the following day. The state's motion for discovery was not finally determined until July 13, 1976.

In summary a large part of the delay is explained by the necessity to determine the discovery rights of both parties. Although the state was negligent in losing the door panel we do not find the delay can be

laid principally at the feet of the prosecution or that the state acted in bad faith to gain a tactical advantage. It is equally inferable from this record the defendant was in no hurry to get to trial.

### 4. Prejudice to Defendant

The defendant included, with his motion to dismiss, affidavits of himself and his wife. In substance these affidavits assert that because of the delay defendant and his wife are experiencing emotional strain, public embarrassment and an inability to obtain financing for his business.

In assessing prejudice from the delay of trial the Supreme Court in *Barker v. Wingo, supra,* said prejudice must be assessed in light of the interests a prompt trial is designed to protect. These interests were identified as: (1) limiting of oppressive pretrial incarceration, (2) reducing the anxiety and concern of the accused, and (3) limiting the possibility the defense will be impaired. Of these factors, the Supreme Court said the third is the most serious.

The defendant was released, after posting a security amount, the day after his arrest and since that time has remained free on the security release. Consequently, the first factor is not applicable.

The potential for anxiety and uncertainty commences when the defendant is arrested and is a natural result of being accused. It continues unabated until the charge against the defendant is finally resolved. Although defendant is prejudiced in some measure by living for nearly four years under a cloud of suspicion and anxiety this prejudice is not sufficient to support defendant's claim he was denied the right to a speedy trial. *See Barker v. Wingo, supra.*

Defendant makes no assertion he was prejudiced in the defense of this charge such as by loss of witnesses or other evidence or by fading memories due to passage of time. Although the passage of time may itself give color to a claim of prejudice, it is not

established simply by the length of delay. *State v. Evans, supra.* Attempted murder of a police officer is a grave charge and the procedural history of the case thus far indicates it is complex. In this light we do not presume impairment of the defense merely because of the passage of a substantial length of time from the date of arrest. We are not convinced by the evidence in this case there is a reasonable possibility of prejudice.

We conclude in balancing the length of delay, the assertion by defendant of his speedy trial right, the reason for the delay, and the prejudice to defendant, no violation of the speedy trial provisions of the state and federal constitutions occurred.

Reversed and remanded.