Argued February 22, affirmed May 15, reconsideration denied
August 2, petition for review denied November 15, 1978

STATE OF OREGON, *Respondents,*

*v.*

JUAN OLIVEREZ aka Miguel S. Ramirez
aka Miguel Ramirez Cisneros, *Appellant.*

(No. 2169-C, CA 8029)

578 P2d 502

Gary D. Babcock, Public Defender, Salem, argued the cause for appellant. With him on the brief was Brian E. Williams, McMinnville.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, Lee, Richardson and Joseph, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Defendant appeals his conviction by jury verdict of first degree murder, former ORS 163.010.[1] There are three assignments of error. Defendant contends the trial court erred when it failed to suppress evidence derived from the use of a polygraph examination. The allowance by the trial court of testimony concerning cause of death is assigned as error because the skull of the victim was not furnished the defense in the course of discovery. The defendant also sought a judgment of acquittal on this basis and the denial of this motion is assigned as error. Finally, defendant contends the court erred in denying defendant's motions for judgment of acquittal based upon the failure of the state to prove malice and premeditation.

The victim, Maria Oliverez, was the wife of defendant. She was last seen alive on October 8, 1971. On that morning the couple's four oldest children left for school, leaving defendant, the victim and a four-month old infant at the family's farm home. When the children returned from school in the afternoon and discovered their mother was gone, defendant told them there had been an argument and she had left the home. The children were told to tell anyone who asked that their mother had gone to Mexico to see her mother.

The family's sofa had been burned and moved outside the house. The handle of Maria's purse and remains of her pen and pocketknife were found in the springs of the burned sofa. The children observed dried blood spots on the wall and floor of the living room and in their parents' bedroom. The spots in the living room were described as the size of a basketball. Defendant explained to the children that Abel, their infant brother, had fallen from his crib and bloodied his nose. A smashed earring belonging to Maria was found on

---

[1] ORS 163.010 was repealed by Oregon Laws 1971, chapter 743, § 432. Defendant was charged and convicted under this section as it appeared prior to repeal.

the floor in the bedroom with dried blood on it. One of the children found a small purse containing Maria's passport and driver's license in defendant's bedroom.

The family lived in a rented house on a farm consisting of 130 acres. About three weeks before Maria's disappearance, defendant dug three holes at various places on the property and used the dirt for fill. Their approximate size was five feet long, three feet wide and two to three feet deep. The property was owned by Dwight Seward who rented it to the family in 1969. Seward saw defendant often. Defendant raised chickens and pigs on the farm and, according to Seward, butchered the latter effectively with a butcher knife.

The police conducted an investigation shortly after Maria's disappearance, but it was discontinued because the results were inconclusive. In September 1974, nearly three years after Maria's disappearance, defendant was arrested in Idaho on theft charges. Based on information received during this investigation, the inquiry into Maria's disappearance was reopened.

In the course of an interview with defendant on September 10, 1974, Officer Rodriguez of the Nyssa, Oregon, Police Department asked defendant if he would be willing to take a lie detector test. Defendant was told that the purpose of the polygraph examination was to ascertain whether he was responsible for the presence of a large amount of stolen merchandise found in his home. The disappearance of Maria was mentioned only once during the interview, and this was in reference to locating her in Mexico so she could take care of the children while defendant was in custody. Defendant agreed to take a polygraph test, which was scheduled on September 18th.

Between the September 10th interview concerning the stolen property and the September 18th polygraph examination, Officer Rodriguez spoke with three of

[ 420 ]

the Oliverez children. As a result of these conversations, an attempt was made to find Maria's body buried on the premises.

This effort proved unsuccessful. On September 18th Officer Lattin of the Oregon State Police conducted a polygraph examination of defendant. Defendant was again advised of his rights and was informed that the questioning would concern the disappearance of his wife, not the theft charges on which he was being held. As a direct result of the polygraph examination, a body identified as the remains of Maria was found buried on the property. Defendant contends the trial court should have suppressed all evidence derived from this polygraph examination because he did not voluntarily submit to the examination.

■ Even though the fact of or the results of a polygraph examination are not generally admissible the police may use a polygraph in their investigation and the admissibility of evidence obtained as a result of the examination depends upon whether the polygraph test was taken voluntarily. *State v. Green,* 271 Or 153, 531 P2d 245 (1975); *State v. Clifton,* 271 Or 177, 531 P2d 256 (1975).

■ The trial court held that defendant was fully advised in English and Spanish of his rights, pursuant to *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966), and that he did not have to take the polygraph and that the machine could determine if he was telling the truth. It was also explained to defendant that the polygraph interview would concern his wife's disappearance not his involvement in the theft for which he had been arrested. The court specifically found that defendant understood his rights and concluded he voluntarily submitted to the examination. There was ample evidence to support the court's findings and conclusions and we will not retry this factual issue. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. Gaylor,* 24 Or App 933, 547 P2d 651, *rev den* (1976).

On oral argument in this court defendant raises a novel contention respecting the voluntariness of his decision to take the polygraph examination. He argues the police should have advised him that if he gave deceptive or untruthful answers to questions, the police may infer the opposite is true and based on this inference conduct further investigation and possibly discover incriminating evidence. It was explained to defendant that the polygraph could detect if he gave untruthful answers to questions. He was thus aware that if he lied the police might know it. It is not material or relevant to the question of the voluntariness of his decision to submit to the test as to how the police will utilize the information in their investigtion. We decline to adopt the rule suggested by defendant. The motion to suppress evidence regarding discovery of the body and other evidence resulting from an examination of the remains was properly denied.

Defendant next contends that testimony of the pathologists respecting the cause of death should have been suppressed because the victim's skull was not made available to him for an independent examination. He asserts a right to discovery of the skull under ORS 135.815 and *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963).

When the remains were exhumed some three years after Maria's disappearance the head was found to have been skillfully severed from the body. The remains were badly decomposed. Dr. Brady, the State Medical Examiner, disposed of the skull after he had completed his examination. He took photographs and retained only a small portion of dried granular substance he identified as blood, taken from a large depression fracture in the skull. These items were made available to the defendant.

The court, on motion of defendant, held the failure of the state to retain the skull and make it available to defendant violated his constitutional right to discovery set forth in *Brady v. Maryland, supra.* The court

specifically held the skull was not discoverable under ORS 135.815. The court allowed defendant's motion to suppress to the extent that the state was precluded from offering testimony of Dr. Brady as to the cause of death based on his examination of the skull. The court, however, allowed evidence of the cause of death to be received through the testimony of another pathologist who based his opinion upon review of Dr. Brady's photographs and the sample of dried blood.[2] All of these items were made available to the defendant.

We agree with the trial court that the skull was not discoverable under Oregon's discovery statute because the state did not intend to offer the skull in evidence. *See State v. Koennecke,* 274 Or 169, 545 P2d 127 (1976). We also conclude the constitutional standard of discovery enunciated in *Brady v. Maryland, supra,* does not require a contrary result. The United States Supreme Court in *Brady* held it was a violation of defendant's due process rights for the state to suppress evidence which is favorable to the defendant and material to his defense. Defendant has the burden of proof to establish with some particularity that the evidence will be favorable. *State ex rel Dooley v. Connall,* 257 Or 94, 475 P2d 582 (1970). It is not sufficient that the showing disclose merely a hoped for conclusion from examination of the destroyed evidence, nor is it sufficient for the defendant to show only that the examination of the evidence would be helpful in preparing his defense or cross-examining the state's witnesses. *United States v. Agurs,* 427 US 97, 96 S Ct 2392, 49 L Ed 2d 342 (1976); *State v. Koennecke,* 29 Or App 637, 565 P2d 376, *rev den* (1977).

The pathologist called by the state testified that in his opinion the skull fracture was the cause of death. Defendant contends an examination of the skull would be exculpatory by speculating it would disclose the

---

[2]Defendant does not raise any issue as to the propriety of this procedure and we express no opinion as to whether it is proper.

skull fracture was administered after the victim's death. In light of the fact that the head was severed from the body it is difficult to imagine how establishing that the skull fracture was postmortem would be helpful to defendant. We conclude defendant has failed to establish that an examination of the skull would be material and favorable to his defense.

■ The final assignment of error is the failure of the court to grant a motion for judgment of acquittal. Defendant contends there was no evidence of deliberation, premeditation or malice sufficient to establish either first or second degree murder as defined in the former ORS 163.010 and 163.020. First degree murder was the killing of another purposely and of deliberate and premeditated malice. Since defendant was convicted for first degree murder it is sufficient to determine if there was evidence from which a jury could conclude Maria was killed purposely and with premeditated malice. We conclude that there was. *See State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974).

Affirmed.