Argued and submitted November 26, 1980, reversed and remanded for trial January 19, reconsideration denied February 26, petition for review denied March 17, 1981 (290 Or 651)

## STATE OF OREGON,

*Appellant,*

*v.*

## DENNIS RAY MOWER,

*Respondent.*

## (No. C79-10-33734, CA 17739)

622 P2d 745

Robert C. Cannon, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

David Lowell Slader, Portland, argued the cause and filed the brief for respondent.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

THORNTON, J.

## THORNTON, J.

The state appeals from a trial court order dismissing the indictments for first degree burglary and second degree assault on the ground that the state failed to perform certain blood enzyme tests on bloodstains found on clothing seized from defendant or to preserve the clothing so that tests could be made and therefore violated defendant's due process rights under *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963).

The following are the essential facts:

The victim was stabbed eight times by an unknown assailant who had apparently entered her apartment by prying open a sliding patio door. Within two and a half hours of the first report, police investigation led to defendant. At the time of his arrest, defendant was wearing a jacket similar to that described by the victim and her roommate. Police seized the jacket, along with other items of defendant's clothing, all of which had bloodstains on them. At the time of his arrest, defendant had a cut on the little finger of his right hand which was still seeping and had not been treated. Defendant's explanation was that he had cut himself while cleaning up glass from a broken Coke bottle at his place of work. At defendant's urging, the police went to the Swift Mart where defendant worked. Although they found broken glass where defendant stated they would, they found no visible evidence of blood and did not seize any glass nor the mop used to wipe the floor. The officer testified that it was possible to detect blood on glass shards even though no traces were apparent.

Defendant was taken into custody, where he remained until charges were dropped eight days later. The reason for dropping the charges was the need for further investigation which specifically included further blood tests. A standard sample of the victim's blood was obtained during this period and delivered together with the bloodstained clothing to the state crime lab. No blood was taken from defendant before his release and he shortly thereafter moved to California. He did not give a blood sample until over two months later, after he was indicted and voluntarily returned to Oregon for arraignment.

Preliminary blood group tests showed that the blood on the clothing was type O blood. Both defendant and the victim had type O blood. There was evidence that normally a series of tests for six different enzyme factors is undertaken, which would identify whose blood matched the stains. However, these tests produce conclusive results only if run within four to six weeks. With proper storage (in -20 degree F storage lockers), the time limit for these tests may be extended to three months or more. No tests in this case were made until over four months after the incident and they proved inconclusive. The state's evidence was that the tests were not run earlier because of a lab policy that this type of test would not be run unless blood standards from both the defendant and the victim were available. Defense counsel did not directly request the lab to run the tests, although defendant had a statutory right to make such a request (ORS 181.080(3)), because he was informed by the deputy district attorney in charge of the case that such tests would be run. The parties stipulated that defense counsel had made repeated requests for the results and had no knowledge that defendant's blood sample was required before testing could be done.

Defendant moved to suppress all evidence relating to the clothing and bloodstains thereon and, in the alternative, moved to dismiss the indictments. The trial court concluded that, as a result of an unreasonable application of the lab policy requiring the blood standards of both persons, the state had inadvertently allowed evidence material to defendant's defense to be destroyed and, because a showing that the blood on the clothing was not that of the victim was the most persuasive evidence of innocence defendant could offer, he found that the defense had been sufficiently prejudiced to warrant dismissal of the indictments.

The state makes three arguments in challenging the trial court's ruling: (1) that there was an insufficient showing by defendant that the results of the enzyme tests would have been favorable to him; (2) that defendant failed to make a timely request to have the tests run; and (3) that dismissal is too severe a sanction for any violation of *Brady* that may have occurred in this case.

■ Referring first to the state's contention that defendant failed to make a timely request to have the tests run, the evidence was that defendant's counsel had been informed by the deputy district attorney in charge of the case that such tests would be run. Further, that between the time of defendant's arrest (October 22, 1979), and the time the tests were attempted (March 10-14. 1980), the case was handled by three different district attorneys. The evidence and stipulation show that defense counsel had contact with all three concerning enzyme testing but was not aware that the tests had not been performed nor the reason therefor until March 1.

■ ■ We begin our analysis of the *Brady* issue with this proposition:  In order to show a violation of the constitutional right set forth in *Brady,* to discover exculpatory evidence in the state's possession, a defendant must demonstrate, to the extent possible under the circumstances, that the evidence is both favorable and material to an element of his defense. *State v. Koennecke,* 274 Or 169, 179, 545 P2d 127 (1976). If the blood found on defendant's clothing proved to be from someone other than the victim, it would constitute strong circumstantial evidence that defendant did not commit the crime and would therefore be material to his defense.

■ The scope of the required showing of favorableness must be gauged against what it would be possible to show under the circumstances. There must be at least a contention by defendant that the evidence will be favorable. *State v. Koennecke, supra,* 274 Or at 180. Where the evidence sought to be disclosed is the result of a scientific test which the state has already performed, defendant must show that a retest would have been possible and call the results of the state into question either by attacking the manner in which the test was conducted or by other evidence. *State v. Michener,* 25 Or App 523, 550 P2d 449 (1976) (video tape of defendant at time of his arrest for driving under the influence showed no indications of inebriation); *State v. Lance,* 48 Or App 141, 616 P2d 546 (1980) (evidence of fluid seepage suggested master brake cylinder might have leaked causing brake failure). Where the state has not tested the substance prior to its destruction or loss and

there are no other facts which would indicate that the test results might prove unfavorable to defendant,[1] little more can be required than a showing that the test could have been performed and results obtained which, in the context of defendant's version of the facts,[2] could have proved exculpatory.

■     We conclude that defendant has met his burden here. He proved that the enzyme test would have identified the source of the blood and that the state had the clothing and a sample of the victim's blood in time to permit it to rule out the victim as the source of the bloodstains. He offered, as the trial court found, a plausible explanation for the presence of blood on his clothing (i.e., the broken bottle), and that avenue of corroboration, through no fault of defendant's, has been foreclosed. It is true, as the state contends, that defendant's projection as to what the enzyme tests would show amounts to speculation, but, under the circumstances, no further showing was possible.

The source of the blood, given the manner in which the crime was committed, is an important issue in the case. Unfortunately, as a product of the state's inadvertence and application of a state laboratory policy, that source is irretrievably beyond the reach of scientific ascertainment. Due process requires that the prejudicial effect of the loss of this evidence be offset by imposition of an appropriate sanction.

---

[1] This case is distinguishable from *State v. Hockings,* 23 Or App 274, 542 P2d 133 (1975), *rev den* (1976), which involved destruction of 62 fingerprint "lifts" (out of approximately 90 taken). Although defendant was similarly prevented from showing what his examination of the rejected lifts would have revealed, the state made a strong showing that the results would have proved inconclusive and immaterial. There was evidence that many of the "lifts" were useless for any identification purposes. Further, it was mere speculation that one of the "lifts" might have proved to be that of an unidentified third person. Finally, the presence of an unaccountable fingerprint at the crime scene did not explain the presence of defendant's fingerprints near the bodies the victims. Here defendant showed that the tests would have been both possible and conclusive of the source of the bloodstains.

[2] *Cf. State v. Oliverez,* 34 Or App 417, 578 P2d 502 (1978), *rev den* 284 Or 235, where the court held that destruction of the victim's skull did not violate defendant's *Brady* right because he did not show that the evidence he sought from reexamination of the skull (i.e., that the skull fracture was not the cause of death because it had been inflicted postmortem, contrary to the state pathologist's testimony) would not necessarily have been favorable in light of defendant's story and the fact that the victim's head had been severed from the body.

■    We do not believe, however, that dismissal was appropriate here. There was other circumstantial evidence linking defendant to the crime which would permit a jury to find that defendant was the perpetrator. Even if defendant had been able to establish that the blood on his clothing was not that of the victim, it would not have conclusively established his innocence. In *State v. Lance, supra,* we held that dismissal of the indictment for criminally negligent homicide was too harsh where the state had negligently permitted a brake cylinder to rust so that it could not be retested to determine whether it had failed and that the prejudice to defendant could be cured by requiring the state to stipulate that the brakes were not functioning at the time of the accident from which the charges against defendant stemmed. 48 Or App at 145. That sanction was appropriate because it gave the defendant the full benefit of what the retest might have shown and permitted the state to establish, if it could, that the accident was the result of defendant's drinking and speeding, rather than brake failure.

We conclude that the prejudice to defendant in this case can be corrected by excluding all evidence, including the clothing, and argument by either party relating to the blood stains on defendant's clothing. The state is thereby prevented from enhancing its theory of the case by showing that the blood on defendant's clothing (the presence of which by itself is somewhat unusual) matches the victim's blood type which, despite the fact that it also matches defendant's, would permit the jury to infer that it is the victim's blood. Similarly, defendant may not argue from the exclusion of this evidence that the state failed to show that defendant had any blood on his clothing.

Reversed and remanded for trial.