Argued and submitted November 26, 1980, affirmed February 17, reconsideration denied March 26, petition for review allowed April 21, 1981 (290 Or 853)

# STATE OF OREGON,
## *Respondent,*
### *v.*
# DENNIS DEAN KERSTING,
## *Appellant.*

## (No. C 79-01-30263, CA 15260)

623 P2d 1095

462-a

Phillip M. Margolin, Portland, argued the cause and filed the briefs for appellant.

Karen H. Green, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

Defendant appeals his conviction for the murder of a young woman. He assigns as error the admission in evidence of (1) expert testimony regarding identification of hair by microscopic comparison, (2) testimony regarding a statement made by defendant to Jim Juan, and (3) a photograph of the victim. Defendant also challenges (4) the trial court's refusal to allow certain cross-examination of one of the state's witnesses, and (5) the denial of his motions to suppress and dismiss based on the destruction of blood samples found in his tow truck. We affirm.

Shellie Szabo met her death by being stabbed over 15 times in the early morning hours of November 26, 1978. Rope burns were found on her wrists and several human hairs and rope fibers were found on her person. Time of death was placed at shortly after 3 a.m. Ms. Szabo worked as a prostitute and generally served well-to-do businessmen. Her most common *modus operandi* was to arrange to meet a customer at a restaurant, after which they would go to a motel. She charged a minimum of $50.

Ms. Szabo was pursuing her occupation on the night of the murder. She was seen downtown near a phone booth at about 2:10 a.m. The switchboard operator at the motel where she and her boyfriend were staying testified that Ms. Szabo called for her boyfriend at 2 a.m. that night. A businessman, who was both a friend and a customer of the victim, was out late that night. On his way home he decided to try to find Ms. Szabo because she had left several messages on his telephone answering device during the preceding few days. He drove to a restaurant he knew she frequented, but did not find her. He decided to try another restaurant; while en route, and as he approached the intersection of Grand and Holladay at about 3:05 a.m., he noticed a tow truck in front of him in the lane to his left. As he pulled alongside the truck, he saw Ms. Szabo sitting in the passenger seat. She looked directly at him from a distance of about six feet but she did not wave to him when she saw him, which he thought unusual. She had a look of terror on her face and was signaling to him by moving her head and shoulders, and thus appeared to be bound. The tow truck turned left at the intersection, and although Ms.

Szabo's friend turned around to follow the truck, he lost it in the fog. He continued unsuccessfully to look for her and finally went home at 5 a.m. He was so disturbed by the incident that upon arriving home he woke his wife to tell her about it. The next day, when he discovered that Ms. Szabo had been murdered, he reported the incident and gave a description of the truck to the police.

The description of the tow truck led the police to Gerlock Towing, where defendant worked. Upon searching the truck assigned to defendant, the police found small amounts of encrusted blood and a rope with drops of blood on it. Vacuum sweepings of the truck's interior contained fibrils which were consistent with the material of the victim's sweater. The rope fibers found on the victim were consistent with the rope in the truck. A luminol test performed on the truck seat indicated that a large amount of blood had been present on the seat and seat-back.

The police first contacted defendant on November 29th for questioning. Defendant is a knife collector who enjoyed obtaining and carrying knives. Defendant was searched and five pocket knives were found on his person. Police seized 13 more knives upon searching defendant's home.

At first, defendant denied any knowledge of Ms. Szabo or her murder. He stated that he left home the night of the murder at about 12:30 a.m. to buy a Coke. Afterward, he went by two friends' homes, but when he found no one home he drove to a restaurant at Ninth and Burnside where he stayed for about two hours, watching people from his truck. He then drove home about 3 a.m.

The next day when defendant was questioned again, he admitted having seen Ms. Szabo at the restaurant and having engaged her for a sexual act. He said she agreed to perform oral sex in his truck for $20, paid for with two fives and a ten dollar bill, and that they drove about four blocks away to complete the act. After about 20 minutes he drove her back to within two blocks of the restaurant. He stated he last saw her walking toward the restaurant in her socks, carrying her shoes.

Defendant further stated that he had not cleaned the inside of his truck for six or seven months, although he had washed the outside the previous Friday. Defendant testified at trial, however, that he cleaned the inside of his truck every Friday in order to get his paycheck, and denied having told the police that he had not cleaned the interior for six months.

Police investigators found Ms. Szabo's shoes lying near her body, which was found in bushes approximately one mile from where defendant's tow truck had been seen with Ms. Szabo in it and along the route the tow truck appeared to be following. Except for dirt on one of the victim's heels, which corresponded with a drag mark near the body, her white socks were clean and dry. Forty-five dollars were found in the victim's left sock, but no five dollar bills were present. The autopsy revealed that the victim's wounds were consistent with a strong, doubly-incised blade one inch in width. None of the wounds was deeper than seven inches. One of the wounds had a hilt mark on it consistent with the unique hilt of a "Mark II" survival knife seized from the defendant. The "Mark II" knife has a seven and one-half inch, doubly-incised blade. The man who sold the "Mark II" knife to defendant testified that his records showed he had sold two such knives to defendant. A second knife was not found.

I.

Defendant first assigns as error the trial court's admission of expert testimony on microscopic hair analysis and comparison. Ms. Carpenter, the state's expert, testified that hairs found in the decedent's hand, outer sweater, and turtleneck sweater were "similar" to or "indistinguishable" from hair samples taken from defendant. Defendant challenges this evidence on the grounds that (1) Ms. Carpenter was not qualified as an expert witness, and (2) microscopic hair comparison should not be admissible unless the scientific method used to make the comparison is generally accepted as reliable in the scientific community.

At trial defendant did not challenge Ms. Carpenter's qualifications as an expert, so that issue is not properly before us. Accordingly, we consider only the second argument.

Defendant's contention that the questioned evidence should not have been admitted raises issues which have attracted the attention of courts, attorneys, and forensic professionals for many years in an effort to resolve the question of what standard should govern the admissibility of scientific evidence. *See generally,* Mossens and Inbau, *Scientific Evidence in Criminal Cases,* § 1.03 (2d ed 1978). Two basic approaches have evolved. The first is that scientific evidence is not admissible unless the scientific technique in question has gained general acceptance in the relevant scientific community. The second approach is that scientific evidence is admissible once a showing of its reasonable reliability is made, without regard to whether the method has attained general acceptance. Oregon has not yet taken a definitive position on this issue.

■ The case of *Frye v. United States,* 293 F 1013 (DC Cir 1923), formed the genesis of the rule which requires that, prior to the admission of expert testimony based on the application of a scientific technique, a foundation must be laid as to general acceptance of the technique within the relevant scientific community. *Frye* involved a defendant's attempt to introduce evidence of a systolic blood pressure test (a precursor to the modern polygraph test) which indicated his innocence. The court stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs."* (Emphasis supplied.) 293 F at 1014.

The rationale of *Frye* [1] has since been applied by an apparent majority of courts determining the admissibility of

---

[1] A number of courts rely, in essence, on the *Frye* rationale, but require only that a scientific test be generally accepted by the members of the specialized field who deal with the subject of the scientific test. *E.g., Commonwealth v. Lykus,* 367 Mass 191, 327 NE2d 671 (1975); *People v. Williams,* 164 Cal App 2d Supp 858, 331 P2d 251 (1958) (general acceptance of test by individuals who would be expected to be familiar with its use is all that is required in this age of specialization).

scientific evidence. *See Reed v. State,* 283 Md 374, 391 A2d 364, 97 ALR3d 201, 207-09 (1978); Annot., 97 ALR3d 294 (1980) (admissibility of voice print evidence); McCormick, Evidence § 203, at 488-89 (2d ed 1972).

■ A minority of courts have rejected the *Frye* approach as unnecessarily restrictive to the admissibility of otherwise relevant scientific evidence. These courts have adopted, instead, a "reliability" test, under which scientific evidence is admissible if the trial court determines that a foundation as to its reasonable reliability has been made. *E.g., United States v. Baller,* 519 F2d 463, *cert den* 423 U.S. 1019, 96 S Ct 456, 46 L Ed2d 391 (4th Cir. 1975); *State v. Hall,* 297 NW2d 80, 86 (Iowa 1980); *see* Annot., 97 ALR3d, *supra* at 316-21. Thus, once a competent expert testifies that the scientific process in question is reliable, refutation evidence or evidence of disagreement in the scientific community regarding the reliability of the process bears on the weight, not the admissibility, of that evidence. *Id.*

This question of the admissibility of scientific evidence was subjected recently to exhaustive analysis in *Reed v. State, supra,* a case involving identification by voice print analysis. A capsulization of the arguments presented in the majority and dissenting opinions in *Reed* is illustrative of the reasons advanced in most cases addressing this question.

The majority in *Reed* advanced the following reasons in favor of its decision to adopt the *Frye* test:

(1) The criterion of "general acceptance" in the scientific community has become the standard in almost all of the courts in this country which have considered the question.

(2) Fairness to a litigant requires that before the results of a scientific process can be used against him, he be entitled to a scientific judgment on the reliability of that process.

(3) Lay jurors tend to give considerable weight to 'scientific' evidence when presented by experts, and new scientific tests often obtain an aura of certainty which obscures their experimental nature.

(4) The test protects both prosecution and defense by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination.

(5) Under the reliability test, evidence which some experts consider to be reliable would be admissible. Each factfinder would then be called upon to determine, in the course of its deliberation, the validity of the particular scientific process. Thus, on the same evidence, one trier of fact might determine that the technique is unreliable and ignore the results, while another might determine that it is reliable and convict or acquit on the basis of those results. This inconsistency concerning the validity of a scientific test would be intolerable, and is largely avoided under the *Frye* test.

(6) Under the reliability test, the introduction of evidence of a scientific test not generally accepted in the scientific community is likely to distract the jury's attention from the real issues in the case by elevating the question of the reliability of the process to the status of a central issue in the trial. The proceedings may well degenerate into a trial of the technique itself. The *Frye* approach is designed to forestall this eventuality.

The dissent in *Reed* advanced the following key arguments in favor of the reliability test:

(1) The *Frye* rule was formulated in a case involving a lie-detector test, which evidence invades the jury's province of assessing the credibility of a witness. Other types of scientific evidence do not usurp this critical function, but rather aid the jury in determining the facts. Hence, it is inappropriate to extend the *Frye* rule beyond cases involving scientific assessments of a witness' credibility.

(2) McCormick's Handbook of the Law of Evidence, § 203 at 491 (2d ed 1972), states:

" 'General scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified

expert witness should be received unless there are other reasons for exclusion."

(3) The standard of 'general acceptance' is a nebulous concept which requires something greater than acceptance by the expert himself but less than acceptance by all experts in the field. The test lacks definiteness and uniformity of application, and is not required in other areas of expert testimony.

(4) The *Frye* test unnecessarily limits admissibility of new methods of scientific investigation. Under the reliability test, scientific evidence could be submitted to the jury upon a showing of reasonable reliability. Based on its determination of the accuracy and reliability of the evidence, the jury would decide the weight to be accorded it. The jury performs the weighing function with regard to other types of evidence, and is competent to do so with regard to scientific evidence.

(5) The trend in federal courts is toward the admission of expert testimony, including scientific testimony, which will assist the trier of fact to understand the evidence or to determine the fact in issue.[2] *Reed v. State, supra* 391 A2d at 377 (Smith, J., dissenting). *See also State v. Hall,* 297 NW2d 80 (Iowa 1980).

■ Oregon courts have discussed the admissibility of one type of scientific evidence, the polygraph test, at some length. The results of a polygraph examination are not admissible in a civil or criminal proceeding unless both parties consent. *State v. Green,* 271 Or 153, 531 P2d 245, 91 ALR3d 1301 (1975); *State v. Clifton,* 271 Or 177, 531 P2d 256 (1975); *State v. Skelton,* 41 Or App 497, 500-01, 599 P2d 1171 (1979); *Sandlin v. OWCC,* 28 Or App 519, 522-23, 559 P2d 1308 (1977).

The Oregon Supreme Court has observed:

---

[2] Rule 702 of the Federal Rules of Evidence adopts a liberal approach to the admission of expert testimony:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

"[t]he principal reason for rejecting such evidence is that the polygraph has not yet attained general scientific acceptance as a reliable and accurate means of ascertaining truth or deception, as required as a prerequisite to judicial acceptance of new scientific techniques and devices. [Footnote omitted.]"

*State v. Green, supra,* 271 Or at 165-66; *accord, State v. Clifton, supra,* 271 Or at 181. In *Green* and *Clifton,* the Supreme Court stated that the general acceptance test was the "principal reason" given by *other* courts in rejecting polygraph results, but it did not expressly adopt that test in Oregon. Neither has the court stated how the general acceptance test comes into play—does the court take judicial notice of such acceptance, or does the proponent have the burden of establishing such acceptance?

■■ In some instances, a scientific technique's validity and reliability may have attained such broad acceptance in the relevant scientific community that a court may take judicial notice of that acceptance. That appears to be the case, for example, with regard to ballistics tests, fingerprint identification, and certain blood tests. However, where, as here, judicial notice may not be taken properly because relatively new scientific techniques are involved, the question is what foundation, if any, must be laid to permit the expert testimony to be considered by the jury. We are satisfied that under these circumstances, and where the question is raised, some foundation is required as a prerequisite to the admission of the evidence. Both *Green* and *Clifton* assume that proposition.

There is something to be said for both the *Frye* and the reliability tests. In all, however, we conclude that the reliability test is the more acceptable one. The *Frye* test purports to keep the trial uncluttered by having the judge make an initial determination that the scientific technique is generally accepted; if it is, the evidence is admitted. However, if an adjunct of that approach is that the opposing party (here the defendant) may not put on expert evidence, including evidence as to the scientific community's acceptance of the techniques involved, we believe it is unduly restrictive, particularly in a criminal case. On the other hand, if the opponent may adduce such evidence, a

principal objective of the rule is defeated —the jury would be permitted to decide the general acceptability question.

Furthermore, it is not clear that under *Frye* what results flow from a judge's determination of general acceptance based upon the showing made in a given case. Does that determination govern all future cases? If so, a technique which is, in fact, not generally accepted may bind future litigants because the opponent of the technique in the original case failed to do his homework. If not, then a scientific technique may be treated judicially as generally accepted in one case, but not in another. That seems to be a highly unscientific way in which to treat scientific evidence.

Given the foregoing flaws, we conclude that the only foundation required where the technique has not been accepted in this state is that there be credible evidence on which the trial judge may make the initial determination that the technique is reasonably reliable. If so, then the evidence may be admitted and the weight to be given it is for the jury, who may consider evidence as to its reliability.

■   The issue here was raised in a pretrial hearing at which the opposing experts testified. The evidence does not support a finding that the scientific techniques employed by the state's expert (microanalysis of hair for identification purposes) are generally accepted in the scientific community. *But see People v. Watkins,* 78 Mich App 89, 259 NW2d 381 (1977) (adequate foundation for such technique was laid). The evidence is, however, sufficient to support a finding that such techniques are reasonably reliable.[3]

We hold, therefore, that it was not error to admit the evidence.

## II.

■ ■   Defendant's second assignment of error challenges testimony by Jim Juan, a friend of defendant, regarding inculpatory statements defendant made to him in a telephone conversation. Out of the presence of the jury, Mr.

---

[3] In *State v. Harris,* 241 Or 224, 405 P2d 492 (1965), admissibility of evidence of hair comparison was not challenged on grounds of reliability or lack of foundation as to general scientific acceptance of hair microanalysis. The only objection was that the hair identification was not conclusive, and the court held that objection went only to the weight but was not a basis for exclusion.

Juan stated that after defendant admitted to him that he had lied initially about not having had Ms. Szabo in his truck on the night of the murder, Juan asked defendant what other evidence the police were going to find against him. Juan stated that although he could not recall the exact words defendant used in response, defendant said either, "there isn't any more," or "I don't think so," or that he had "gotten rid of it and there wasn't any more." Defendant objected to this testimony on the ground that Juan was unable to remember the conversation with sufficient accuracy to give a trustworthy account of it. The court ruled that the witness could testify.

Juan testified at trial as follows:

"Q  And with further reference to that conversation, can you tell the jury what he told you with respect to any evidence that the police were looking for?

"A  Oh, yeah. It was just—he paused—I got a little uptight when he told me that she had been in the truck, so I countered with, well, just what else are they going to come up with?  And he said, nothing—or he didn't think they'd come up with anything else, or it was all gone— gotten rid of, or something along those lines.

"He said there was no more evidence to come about; there wasn't any to be had."

Oral admissions of a party defendant are admissible against him as an exception to the hearsay rule. However, such admissions are to be viewed with caution by the trier of fact, and the jury should be so instructed in an appropriate case. ORS 17.250(4); *State v. Bouse,* 199 Or 676, 698, 274 P2d 800 (1953). The court in *Bouse* stated:

"The reason for this rule [requiring a cautionary instruction] is obvious. A party making an alleged oral admission may have been misinformed or may not have clearly expressed his meaning, or the witness testifying thereto may have misunderstood him; or it may be that the witness who testifies to the admission, by intentionally or unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. On the other hand, if the jury believes from the evidence that the alleged admissions were clearly and understandingly made by the party, that they have been precisely identified and that the language used is correctly remembered and

accurately reported by the witness, it is entitled to consider them for what it may deem them to be worth against the party making them." 199 Or at 698-99.

Although Juan did not remember the precise language used by defendant, he remembered the gist of it, and the jury was properly instructed to view defendant's admission with caution. It was for the jury to give Juan's imprecise recollection the weight it deemed appropriate. There was no error.

### III.

■   Defendant's third assignment of error relates to the admission into evidence of an ordinary photograph of the victim's face, taken some time prior to her death. Defendant objected on grounds of relevance, and argues here that the sole purpose for introducing the picture was to create sympathy for the victim among the jurors.

Part of the state's case was that Ms. Szabo was a beautiful woman who had a higher-class clientele than the run of the mill prostitute and charged higher rates ($50 to $200). Further, the state introduced evidence that Ms. Szabo worked primarily out of motels and would not have accepted what is termed a "car date." This characterization of Ms. Szabo tended to contradict defendant's statement that for $20 she willingly agreed to have sex in his tow truck. Furthermore, the state attempted to prove that Ms. Szabo's physical beauty and unavailability to the defendant were central to his motive to kill her. The photograph was not inflammatory and tended to prove the state's theory of the case; therefore, it was properly admitted as relevant. ORS 41.230.

### IV.

■ ■ Defendant next contends that the court erred in prohibiting him from impeaching the credibility of the witness who saw Ms. Szabo in the tow truck by inquiring of him whether he ever supplied Ms. Szabo with drugs. As already mentioned, this witness testified that he and Ms. Szabo were friendly and that she would discuss her personal problems with him. He further testified that he saw Ms. Szabo riding in a tow truck shortly before she was murdered.

The proffered evidence was correctly excluded for impeachment purposes for two reasons. First, a witness' credibility may not be impeached by evidence of particular wrongful acts unless the witness has been convicted. ORS 45.600; *State v. Townsend,* 237 Or 527, 392 P2d 459 (1964). Second, the nature of the relationship between Ms. Szabo and this witness was collateral to the witness' ability, in fact, to make a positive identification of Ms. Szabo as the woman in the tow truck. *State v. Gardner,* 16 Or App 464, 518 P2d 1341 *rev den* (1974).

## V.

Defendant's final assignment challenges the trial court's denial of his motion to suppress testimony regarding the blood samples taken from his tow truck, and the denial of his motion to dismiss based on the destruction of those samples. Defendant argues that the state's failure to preserve a portion of the blood for independent testing, and its failure to photograph the results of enzyme tests performed on that blood for independent analysis, deprived him of due process under *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963).

The state is under an affirmative duty to disclose to a defendant any evidence that is favorable to him and material to his guilt or innocence. *Brady v. Maryland, supra; State v. Koennecke,* 274 Or 169, 545 P2d 127 (1976). The duty to disclose includes a duty to preserve evidence prior to trial. *See State v. Michener,* 25 Or App 523, 532, 550 P2d 449 (1976); *State v. Hockings,* 23 Or App 274, 285, 542 P2d 133, *rev den* (1976). In order to show a violation of the constitutional right set forth in *Brady,* a defendant must demonstrate, to the extent possible under the circumstances, that the evidence is both favorable and material to an element of his defense. *State v. Koennecke, supra; State v. Mower,* 50 Or App 63, 622 P2d 745 *rev den* (1981). The scope of the required showing of favorableness is gauged against what it would be possible to show under the circumstances. *State v. Mower, supra.*

Thus, where evidence sought to be disclosed has been functionally destroyed, but was subjected to scientific testing by the state prior to its destruction, a defendant

must show that a retest would have been possible and must challenge the state's test results, either by attacking the manner in which the test was conducted or by other evidence. *State v. Mower, supra; State v. Lance,* 48 Or App 141, 616 P2d 546 (1980); *State v. Michener,* 25 Or App 523, 550 P2d 449 (1976). On the other hand, if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory. *State v. Mower, supra.*[4] If a due process violation is established, the trial court must take whatever action is reasonably necessary to prevent prejudice to the defendant. *E.g., State v. Mower, supra.*

■ Although luminol testing here indicated that a large area of the passenger seat and seat-back of defendant's tow truck had been covered with blood, only a minute amount of blood was actually recovered from the seat. The state's expert removed small flecks of blood from the webbing of the seat fabric in an area about one and one-half inches in diameter, and blotted up additional blood from that area on two or three moistened swabs. Several small spots of blood were also obtained from a rope found in the

---

[4] Defendant does not argue that the state should be prohibited from employing reasonable testing techniques that destroy the evidence being tested. However, citing *People v. Gomez,* 596 P2d 1192 (Colo 1979); and *State v. Wright,* 87 Wash 2d 783, 557 P2d 1 (1976), he urges this court to adopt guidelines controlling the procedures used by government agents in dealing with evidence of a crime, which procedures would ensure the preservation of virtually all potential material, favorable evidence. We have previously recognized that

"* * * [t]he difficulty inherent in requiring the defendant to make some showing of favorableness * * * is even more acute where the evidence has been destroyed. The crux of the problem is that only the prosecution, the defendant's adversary, has any information regarding the destroyed evidence. * * *" *State v. Hockings,* 23 Or App 274, 285-87, 542 P2d 133 *rev den* (1976).

However, in view of the flexible approach adopted by this court, in which the necessary showing of favorableness is measured against the showing which it is possible to make under the particular circumstances, we do not find it necessary at this time to adopt the *Gomez* and *Wright* approach in order to assure defendant's due process rights. We note, however, that questions concerning the deprivation of those rights would be substantially obviated if the state adopted a procedure to notify the defendant that tests are about to be conducted and giving defendant an opportunity to arrange for his expert to be in attendance.

truck. The state's experts testified that virtually all of the available blood was consumed in the process of typing it and identifying its enzyme content.

Defendant presented evidence to suggest that the blood in the truck was either from his wife's previous menstrual cycle or from the nosebleed of a small boy who had been in the truck approximately four months before. However, any suggestion that the blood was from defendant's wife was disproved by expert testimony (with which defendant's expert agreed), and by evidence that a large amount of blood had been on both the seat and seat-back, and that blood was present on the weatherstripping of the passenger window. The nosebleed suggestion was substantially eliminated as a viable theory by evidence that the blood on the seat and rope was relatively fresh, because enzyme typing was successfully completed and such tests cannot be accomplished after blood is four to six weeks old. Furthermore, the blood on the seat was consistent with the victim's blood, and only 5.6 percent of the population has that particular blood type and enzyme combination. Because the small boy who allegedly bled from the nose was not identified, no blood comparisons could have been made to aid defendant.

There is no question that blood identification evidence is material to this case, and that if more blood had been available it could have been independently tested by a defense expert. However, defendant has neither challenged the methods or results of the state's tests nor contended that the results of retesting would be favorable to him. The same problem exists in connection with defendant's contention that the state's failure to photograph the results of its blood enzyme tests deprive him of due process. *See State v. Ketchersid,* 37 Or App 97, 586 P2d 119 (1978), *rev den* (1979). Hence, defendant has failed to demonstrate a due process violation. *State v. Koennecke, supra,* 274 Or at 180, *State v. Mower, supra.* Defendant's motions to suppress and dismiss were properly denied.[5]

Affirmed.

---

[5] Defendant's reliance on ORS 135.815, the discovery statute, is also misplaced. *State v. Hockings,* 23 Or App 274, 284-85, 542 P2d 133, *rev den* (1976).