Argued and submitted March 6, Court of Appeals affirmed July 10, 1984

# STATE OF OREGON,
*Respondent on review,*

*v.*

# ALVIN HAROLD BROWN,
*Petitioner on review.*

(C81-04-32024; CA A22491; SC S30146)

687 P2d 751

Marc D. Blackman, of Ransom, Blackman & Simson, Portland, argued the cause for petitioner on review. With him on the brief was Diane L. Alessi, Portland.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

JONES, J.

## JONES, J.

On April 3, 1981, the victim in this case was approached by a man whom she did not know. After brief conversation, the man pulled her into the bushes and raped and sodomized her. The encounter lasted approximately 45 minutes. The next day, and again on April 8, the victim identified the defendant, Alvin Brown, as the perpetrator of the crimes by picking his photograph out of a photographic display. The defendant was then arrested and arraigned.

After retaining counsel, the defendant submitted to two polygraph examinations conducted by a private polygraph examiner, Kenneth Simmons, who specializes in criminal defense polygraphy. Simmons reported to defense counsel that his first polygraph examination of the defendant on April 13 produced inconclusive results. Simmons testified:

"A. * * * [T]here were three relevant questions, two relevant questions, did you have sexual intercourse with [the victim] about April 3rd and did you have any sexual contact with [the victim] about April 3rd scored truthful.

"The one question, the only question that went the other direction is did you force [the victim] to have sex with you about April 3rd.

"Q. [by the prosecutor]: And, that scored to the deceptive side?

"A. Right."

On April 21, this same examiner conducted what he called a "peak of tension" examination to determine if the defendant had knowledge of the events surrounding the reported rape. Examiner Simmons concluded that the defendant did not know about the specific details of the crime. The examiner purported to have information that was not available to the defendant concerning a dog, that the rapist had told the victim that he was in the Navy, and that he was driving a red Datsun pickup. After "passing" the second test by the criminal defense specialist, the defendant agreed to take a third polygraph test conducted by a police specialist. However, the defendant refused to stipulate to the admissibility of any results of the police-conducted test prior to submitting to that examination.

Officer Arthur Bell, polygraph examiner for the Portland Police Bureau, conducted the third polygraph examination with the defendant on May 6, 1981. Officer Bell noted that the defendant appeared nervous and admitted that he had worked all day and that the evening before he had smoked marijuana and consumed beer. The defendant was asked specific questions by the examiner which included whether he forced the victim into having sex on April 3, 1981. Polygraph examiner Bell, after finding the results of the test were inconclusive, noted that there was a great lacking in the degree of responsiveness shown in the tracings, stating:

"* * * [T]he result on scoring is a very low total, and an evaluation score which does not reach criterion levels necessary for a conclusive call regarding truthfulness. It is my opinion that there is more evidence of truthfulness demonstrated in this examination than otherwise, but due to any number of factors present during this examination; including lack of rest, use of drugs, alcohol, repeated testing [this is his third on the same issue], personality * * * he does not seem to be very sensitive in any particular part of the exam series."

Prior to trial, the state moved to exclude any reference by the defendant or the state to any and all polygraph examinations taken by the defendant. Following a prolonged hearing, during which three experts testified regarding the polygraph in general and defendant's examinations, the trial court ruled the evidence inadmissible. The defendant was convicted of rape in the first degree and sodomy in the first degree and appealed the convictions to the Court of Appeals which held that, in the absence of a stipulation, polygraph examinations are not admissible, citing *State v. Green,* 271 Or 153, 531 P2d 245 (1975), and *State v. Bodenschatz,* 62 Or App 606, 662 P2d 1, *rev den* 295 Or 446 (1983). We allowed review to address the defendant's contention that "[t]he defendant should have been allowed to introduce evidence regarding his submission to and truthful completion of polygraph examination."

## THE ADMISSIBILITY OF SCIENTIFIC EVIDENCE

The term "scientific" as we use it in this opinion refers to evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary,

explain the scientific principles which are said to give the evidence its reliability or accuracy. *See* Lilly, An Introduction to the Law of Evidence 400 (1978).[1]

Prior to the enactment of the Federal Rules of Evidence in 1975 (and prior to the enactment of the Oregon Evidence Code in 1982), most federal and state courts facing the problem of the admissibility of scientific evidence relied on a test having its genesis in *Frye v. United States,* 293 F 1013 (DC Cir 1923). The *Frye* test, as it has become known, provides that before a court may admit scientific evidence the scientific principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. In this opinion we review the extensive history of the *Frye* test, evaluate alternative tests adopted by our Court of Appeals and other states, and abandon these special tests in favor of resolving the problems of admissibility of scientific evidence by relying on traditional evidence law as codified in the Oregon Evidence Code.

■ The door was left open by the Oregon Legislature and the writers of the Oregon Evidence Code for this court to adopt a new approach to the admissibility of scientific evidence. The commentary to OEC 702 states:

"The Legislative Assembly leaves for judicial decision the standard to be used in determining the admissibility of novel scientific evidence. * * *"

In response, we adopt traditional admissibility standards for expert testimony as set forth in our Oregon Evidence Code.

Justice Mark McCormick of the Supreme Court of Iowa, in his thesis *Scientific Evidence: Defining a New Approach to Admissibility,* 67 Iowa L Rev 879, 880 (1982), contends:

"Four principal benefits can be achieved by abrogating special rules governing admissibility of scientific evidence and substituting traditional analysis. First, the admissibility judgment keeps judicial attention riveted on concepts judges are

---

[1] How courts decide what scientific evidence is to be chosen for special treatment has never been precisely stated. So far as it can be dated, the notion of a special rule of admissibility for scientific evidence seems to have arisen in the 1923 case of *Frye v. United States,* 293 F 1013 (DC Cir 1923), to be discussed in this opinion. McCormick, Evidence 490-91 (2nd ed 1972).

trained to employ. Second, the admissibility decision can be readily adapted to the characteristics of the evidence and the circumstances in which it is offered. Third, the traditional inquiry sharpens analysis without the distractions and collateral issues that can arise with special rules. Fourth, the single approach for all evidentiary issues fosters procedural simplicity and uniformity. * * *"

Under the traditional approach, expert testimony is subject to two main constraints. First, expert testimony must be relevant under OEC 401:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Second, expert testimony must provide some assistance to the trier of fact under OEC 702:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

■ Under the Oregon Evidence Code and traditional evidence law, expert testimony is admissible if it is relevant under OEC 401 and will help the trier of fact in deciding a disputed issue. To be helpful, the subject of the testimony must be within the expert's field, the witness must be qualified, and the foundation for the opinion must intelligibly relate the testimony to the facts. If these conditions are satisfied, the testimony will be excluded only if it is unduly prejudicial, repetitive, or falls under some other exclusionary provision as provided in OEC 403:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In applying OEC 401, 702 and 403, this court must identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission.

■ This case and the case of *State ex rel Gerttula v. Hunnicutt*, 297 Or 448, 687 P2d 777 (1984), present questions which do not turn on the facts of the specific case and are not settled by the trial court's decision. *See* M. McCormick, *supra*, 67 Iowa L Rev at 882. This court, although informed by the trial record and assisted by the trial court's determination, accepts the legislature's invitation as expressed in the quoted commentary and lays down a general rule that unstipulated polygraph evidence is inadmissible under any provision of the Oregon Evidence Code.

## STANDARDS USED TO DETERMINE THE ADMISSIBILITY OF SCIENTIFIC EVIDENCE

### A. *Reasonably Reliable Test: Kersting*

When the issue of admissibility of the polygraph evidence was presented to the trial court in this case, counsel and the trial judge discussed at some length the effect the "reasonably reliable" test adopted by the Court of Appeals in *State v. Kersting*, 50 Or App 461, 623 P2d 1095 (1981), *aff'd on other grounds* 292 Or 350, 638 P2d 1145 (1982), might have in determining the admissibility of expert testimony concerning polygraph results. The Court of Appeals defined the test as follows:

> "* * * [T]he only foundation required where the technique has not been accepted in this state is that there be credible evidence on which the trial judge may make the initial determination that the *technique is reasonably reliable.* If so, then the evidence may be admitted and the weight to be given it is for the jury, who may consider the evidence as to its reliability." (Emphasis added.) 50 Or App at 471.

*Kersting* involved the admissibility of expert testimony evaluating the novel scientific technique of microscopic hair analysis, not the admissibility of polygraph results.

We allowed review in *Kersting* to consider whether the Court of Appeals erred in adopting the "reasonably reliable" test, but found that we could not reach the issue because the challenged evidence was not opinion testimony of experts, but "testimony of mere observations, albeit observations aided by devices." 292 Or at 354. Therefore, this court has not passed on the "reasonably reliable" test formulated by the Court of Appeals.

## B. The General Acceptance Test: Frye

In *Kersting,* the Court of Appeals noted that the case of *Frye v. United States,* 293 F 1013 (DC Cir 1923), formed the genesis of the rule requiring that prior to the admission of expert testimony based on the application of a scientific technique, a foundation must be laid that the technique has obtained general acceptance within the relevant scientific community. *Frye* involved a defendant's attempt to introduce evidence of a rudimentary polygraph test which indicated his innocence. The Court of Appeals noted that a minority of courts had rejected the *Frye* approach as unnecessarily restrictive to the admissibility of otherwise scientific evidence. The Court of Appeals acknowledged that this court has relied on *Frye* in excluding the results of polygraph examinations and quoted this court's statement from *State v. Green, supra,* 271 Or at 165-66:

> " '[t]he principal reason for rejecting such evidence is that the polygraph has not yet attained general scientific acceptance as a reliable and accurate means of ascertaining truth or deception, as required as a prerequisite to judicial acceptance of new scientific techniques and devices. [Footnotes omitted.]' " As quoted in *State v. Kersting, supra,* 50 Or App at 470.

In 1956, the Ninth Circuit adopted the *Frye* standard in *Lindsey v. United States,* 237 F2d 893 (9th Cir 1956), and it has consistently applied it in polygraph cases.

In *United States v. DeBetham,* 470 F2d 1367 (9th Cir 1972), *cert den* 412 US 907 (1973), the defendant sought to introduce exculpatory polygraph evidence. During a four-day preliminary hearing, the defendant presented "volume after volume of testimony" by experts from the fields of polygraphy, psychology, psychiatry and physiology, all vigorously supporting the accuracy of polygraph evidence. Relying on *Frye,* the court concluded that despite a strong showing made by the defendant, "we are not ready to say that the trial judge abused his discretion in rejecting the offer." 470 F2d at 1368.

Some observers believe the general acceptance test of *Frye* should not be left to the trial judge's discretion. Commenting on *United States v. DeBetham, supra,* Professor Ronald S. Matthias recently stated:·

"Because the court cited *Frye* in support of its decision, its invocation of the 'abuse of discretion' standard can only be regarded as an unfortunate contradiction—one frequently committed by other courts and to be repeated by the Ninth Circuit. Reviewing a trial judge's discretion to admit novel scientific evidence only for abuse of discretion, thereby requiring no particular level of scientific acceptance, effectively ignores *Frye*. Determining admissibility by such a standard is indistinguishable from the mere 'relevancy' approach, an approach advanced by some as an alternative to *Frye*." Matthias, *The Admissibility of Novel Scientific Evidence in the Ninth Circuit*, 19 Willamette L Rev 533, 538-39 (1983).[2]

The Maryland Supreme Court in *Reed v. State*, 283 Md 374, 381, 391 A2d 364, 367 (1978), avoided leaving any discretion to the trial court in passing on the admissibility of scientific evidence when it said:

"The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is, therefore, inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established."

In a 1983 Symposium on Science and the Rules of Evidence sponsored by the National Conference of Lawyers and Scientists, Paul C. Gianelli, Professor of Law, commented in defense of the *Frye* test:

"* * * The principal justification for the general acceptance standard is that it screens out unreliable scientific evidence. In *United States v. Addison*, [498 F.2d 741 (D.C.Cir. 1974)], the D.C. Circuit wrote: 'The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice.' [*Id.* at 743-44.]

---

[2] Professor Matthias concluded that the *Frye* standard represents the best reasoned, if somewhat cautious, approach to determine the admissibility of novel scientific evidence.

Similarly, the Michigan Supreme Court has written: 'It therefore is best to adhere to a standard *(Frye)* which in effect permits the experts who know most about a procedure to experiment and to study it. In effect, they form a kind of technical jury, which must first pass on the scientific status of a procedure before the lay jury utilizes it in making its findings of fact.' [*People v. Barbara,* 400 Mich. 352, 405, 255 N.W.2d 171, 194 (1977)(admissibility of polygraph evidence)].

"In addition to reliability, the courts have identified several other supporting rationales for the general acceptance test. The *Addison* court wrote that the *Frye* test also guarantees that 'a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case.' [498 F.2d at 744.] In addition, the California Supreme Court has noted that the *Frye* test 'may well promote a degree of uniformity of decision. Individual judges whose particular conclusions may differ regarding the reliability of particular scientific evidence may discover substantial agreement and consensus in the scientific community.' [*People v. Kelly,* 17 Cal.3d 24, 31, 549 P.2d 1240, 1244-45, 130 Cal.Rptr. 144, 148-49 (1976).] Finally, the Maryland Supreme Court has commented that '[w]ithout the *Frye* test or something similar, the reliability of an experimental scientific technique is likely to become a central issue in each trial in which it is introduced, as long as there remains serious disagreement in the scientific community over its reliability. Again and again, the examination and cross-examination of expert witnesses will be ... protracted and time-consuming ... and proceedings may well degenerate into trials of the technique itself.' [*Reed v. State,* 238 Md. 374, 388, 391 A.2d 364, 371-72 (1978).]" (Text of footnotes in brackets.) Symposium on Science and Rules of Evidence, 99 FRD 187, 191 (1983).

Professor Gianelli then noted criticisms of the *Frye* test by stating:

"Notwithstanding its wide spread judicial adoption, the general acceptance test remains controversial. A number of courts have rejected it and commentators have labeled it 'archaic,'[34] 'a sport,'[35] 'infamous,'[36] and 'antiquated on the day of its pronouncement.'[37] These critics, however, have not escaped unchallenged. One defender of *Frye* has written that the 'condemnations of *Frye* have been of the scattershot variety, hitting anywhere and everywhere, in a frenzied effort to cripple it.'[38]

"The criticisms of *Frye* have focused on a number of different issues * * *. One recurring point is that the heavy

burden demanded by the *Frye* test deprives courts of relevant evidence. One judge has written: 'Society need not tolerate homicide until there develops a body of medical literature about some particular lethal agent.'[39] As would be expected, courts favoring the *Frye* test disagree. According to the California Supreme Court, '[t]he primary advantage . . . of the *Frye* test lies in its essentially conservative nature.'[40]

"A second major criticism of *Frye* focuses on the difficulties of applying the general acceptance standard. According to the critics, the standard is 'remarkably vague,'[41] 'undefinable,'[42] and 'not enlightening.'[43] * * *."

"* * * * *

"Third, even after the proper field has been identified, determining what constitutes 'general acceptance' in that field remains an issue. Dean Strong wrote that the 'resulting standard, something greater than acceptance by the expert himself but less than by all experts in the field, is obviously somewhat lacking in definiteness.'[48]

"Fourth, it is not clear whether *Frye* requires general acceptance of the underlying scientific theory or general acceptance of the technique applying that theory. This issue was raised by the National Academy of Sciences in its report on voice identification: 'The language of *Frye* seems to require acceptance of the underlying theory and not just of the technique itself.'[49] * * *."

---

"34. Moenssens, *Polygraph Test Results Meet Standards for Admissibility as Evidence, in* Legal Admissibility of the Polygraph, 14, 19 (N. Ansley ed. 1975).

"35. 22 C. Wright & K. Graham, Federal Practice and Procedure 87 (1978).

"36. Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System,* 26 Hastings L.J. 917, 923 (1975).

"37. Conrad, *Landmarks and Hallmarks in Scientific Evidence in* Sourcebook in Criminalistics, 37, 38 (C. Hormachea ed. 1974).

"38. Starrs, *"A Still-Life Watercolor": Frye v. United States,* 27 J. Forensic Sci. 684, 685 (1982).

"39. *Coppolino v. State,* 223 So.2d 68, 75 (Fla. App. 1968)(concurring opinion), *appeal dismissed,* 234 So.2d 120 (Fla. 1969), *cert. denied,* 399 US 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970).

"40. *People v. Kelly,* 17 Cal.3d 24, 31, 549 P.2d 1240, 1245, 130 Cal. Rptr. 144, 149 (1976).

"41. 22 C. Wright & K. Graham, *supra* note 35, at 87.

"42. Strong, *Questions Affecting the Admissibility of Scientific Evidence,* 1970 U. Ill. L.F. 1, 14.

"43. C. McCormick, Evidence 490 (2d ed. 1972).

"* * * * *

"48. Strong, *supra* note 42, at 11.

"49. National Academy of Sciences, On the Theory and Practice of Voice Identification 41 (1979. [NAS Report]" *Id.* at 191-93.

Professor Gianelli concluded his defense of *Frye* by observing that if courts are going to make mistakes in assessing the validity of a scientific technique, they should err on the side of excluding reliable evidence rather than on the side of admitting unreliable evidence. *Id.* at 207.

## C. *The Relevancy Test*

The principal alternative approach to the *Frye* test is to treat scientific evidence in the same way that other evidence is treated, weighing its probative value against countervailing dangers and considerations. Professor McCormick advocated this position in his 1972 text:

"* * * 'General scientific acceptance' is a proper condition upon the court's taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, its probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, unfair surprise and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of 'general acceptance' not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances." (Footnote omitted.) C. McCormick, Evidence 491 (2d ed 1972).

Professor Stephen Saltzburg commented at the 1983 Symposium on Science and Rules of Evidence:

"* * * Contentions that *Frye* should be replaced with a relevance analysis are calls for unnecessary reforms. *Frye* * * *

is consistent with the approach that common law courts have traditionally taken toward all evidence, an approach that is carried forward in modern evidence codifications such as the Federal Rules of Evidence. * * * [I]t is not very helpful to debate the question whether *Frye* or a relevance approach to scientific evidence is preferable. The two approaches are essentially the same, despite the frequency with which they are assumed to differ. The question that is more significant is how much success a scientific claim must have before courts will rely upon it. The answer to this question should be the same under *Frye* or a relevance approach." 99 FRD at 209.

The consensus of the distinguished participants[3] in that symposium was that courts should reject the *Frye* test because it is too conservative or ambiguous. Nevertheless, they found the relevancy test not satisfactory because it is too nebulous. In sum, these legal and scientific experts reached a consensus that the screening function of *Frye* should be retained but that the wording should be improved to promote clarity in the procedure and certainty in its effect. However, they were unable to draft or agree upon the wording of any new test.

We generally agree with Professor McCormick's basic approach to the admission of scientific evidence. His approach does not focus on the *Frye* "general acceptance" test or the *Kersting* "reasonably reliable" test, but resolves the issue by applying traditional evidence concepts. His theory is essentially a compilation of the standards for probity of OEC 401 and OEC 702 weighed against the possible prejudicial effect of evidence in OEC 403, set out *supra* 5-6.

■■ However, we believe the "relevancy" test is strengthened by consideration of certain factors set forth by Professor Berger and Judge Jack Weinstein in their 1982 work on

---

[3] There were some 35 participants in the 1983 Symposium including professors of law and of science, judges, legal and scientific administrators, and practicing scientists and attorneys, for example:

- Professor Richard Bolt, Massachusetts Institute of Technology
- Professor Margaret Berger, co-author Weinstein's Evidence
- Professor Michael Graham, author Handbook on Federal Evidence
- Professor Andre Moenssens
- Justice Mark McCormick, Iowa Supreme Court

evidence. In determining whether scientific evidence is probative under OEC 401 and the relevancy and prejudice analysis implicated in OEC 702's helpfulness standard, we believe the seven factors set forth by those authors in 3 Weinstein's Evidence 702[03], pp 702-15 to 702-21 (1982), provide structure and guidance[4] in applying these rules of evidence. The salutary aspect of the *Frye* "general acceptance" test is retained, not as a prerequisite to admissibility, but as one of seven steps in the screening process. Elements of the *Kersting* "reasonably reliable" test are filtered through all the factors. To determine the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702, the following seven factors are to be considered as guidelines:

(1) The technique's general acceptance in the field;

(2) The expert's qualifications and stature;

(3) The use which has been made of the technique;

(4) The potential rate of error;

(5) The existence of specialized literature;

(6) The novelty of the invention; and

(7) The extent to which the technique relies on the subjective interpretation of the expert.

The existence or nonexistence of these factors may all enter into the court's final decision on admissibility of the novel scientific evidence, but need not necessarily do so.[5] What is

---

[4] The evaluation of these factors will usually be done by the trial court in deciding the relevancy of proffered scientific evidence. However, because the admission of polygraph evidence raises an issue of law to be decided by this court, we evaluate these same factors at the appellate level.

[5] These are not the only factors which may be considered. Justice McCormick lists 11 factors in his article *Scientific Evidence: Defining a New Approach to Admissibility,* 67 Iowa L Rev 879, 911-12 (1982):

(1) The potential error rate in using the technique;

(2) The existence and maintenance of standards governing its use;

(3) Presence of safeguards in the characteristics of the technique;

(4) Analogy to other scientific techniques whose results are admissible;

(5) The extent to which the the technique has been accepted by scientists in the field involved;

(6) The nature and breadth of the inference adduced;

important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence[6] under OEC 401 and OEC 702.

## THE POLYGRAPH

Before we discuss these seven factors in reference to polygraph evidence, we set forth a brief description of the polygraph and polygraph technique.

Dr. Stanley Abrams, a Ph.D. in clinical psychology, testified in this case as to the theoretical basis of polygraphy as follows:

"The best way to describe it is the polygraph clearly does not detect lies. What it does is measure various physiologic responses which are precipitated by emotional reactions. They might be mostly probably fear, fear of being caught in a lie, but it might also be conflict. It might also be simply an increase in emotional responsiveness. It operates off of the autonomic nervous system.

"The autonomic nervous system innervates various viscera of the body and controls their functions. It has two branches and you really have to understand this to understand the operation in general because the autonomic nervous system is divided between the parasympathetic and the sympathetic and the two of them operate in opposition to one

(7) The clarity and simplicity with which the technique can be described and its results explained;

(8) The extent to which the basic data are verifiable by the court and jury;

(9) The availability of other experts to test and evaluate the technique;

(10) The probative significance of the evidence in the circumstances of the case; and

(11) The care with which the technique was employed in the case.

[6] As we said in *State v. Classen*, 285 Or 221, 233, 590 P2d 1198 (1979), in referring to a set of standards to be applied in eyewitness identification cases:

"* * * These are not to be taken as a mechanical checklist of 'constitutional' facts. Obviously other facts may also be important, such as the age and sensory acuity of the witness, or a special occupational concern with people's appearance or physical features, or the frequency of his or her contacts with individuals sharing the general characteristics of the person identified. Listing these and other relevant inquiries must not distract attention from the ultimate issue whether an identification made in a suggestive procedure has nevertheless been demonstrated to be reliable despite that suggestiveness. * * *" (Citations and footnote omitted.)

another. So when one inhibits the function, the other does the opposite, it tends to enhance it.

"The parasympathetic system is dominant most of the time and is actually necessary for survival. It operates to enhance growth, repair of the tissues, digestion, things of that nature. But, any time that there is a threat to the organism, regardless what it is, the individual automatically shifts to the sympathetic nervous system which is basically an emergency system which allows the organism to utilize as much of the bodily resources as possible.

"So, for example, what happens is when one shifts over to the sympathetic dominance, the parasympathetic retracts and therefore it sends more blood and nourishment throughout the body. The pupils enlarge and increase the blood sugar and gives the person energy to deal with the threat, whatever the threat happens to be.

"The bronchial, the tubes of the lungs dilate so more oxygen can be taken in and the palms of the hands perspire so you can grasp things readily. Again it allows the individual to deal with * * * a fight or flight reaction so one can fight, run or climb to deal with this effectively. And, this occurs in any individual any time there is a threat.

"So that in a polygraph situation when a person is going to lie, he becomes fearful of being detected in that lie and this results in a shift over from the parasympathetic to the sympathetic dominance. And, all these changes take place which are recorded on the polygraph chart and then can be interpreted from that."

Dr. Abrams' testimony about the polygraph is not unique to this case. Further explanation of the polygraph technique has been described by Chief Judge Gibson of the Eighth Circuit in *United States v. Alexander,* 526 F2d 161, 163 (8th Cir 1975):

"The polygraph technique is based on the premise that an individual's conscious attempt to deceive engenders various involuntary physiological changes due to an acute reaction in the sympathetic parts of the autonomic nervous system. The polygraph machine is an electromechanical instrument which measures and records these physiological fluctuations that are detected with the aid of three basic components: (1) the pneumograph which monitors the respiration rate of the examinee; (2) the cardiosphygmograph which gauges blood pressure and pulse rate; and (3) the galvanometer which measures the galvanic skin reflex or electrodermal response—

skin resistance to electrical current (perspiration on the palmar surfaces of the hands will increase the flow of electrical current). Some of the more recent polygraph machines have incorporated a device that detects unobservable muscular activity believed to accompany intentional attempts to control the other responses that are recorded by the polygraph. All of the physiological responses detected by these components are transmitted by a recording pen onto a constantly moving piece of graph paper, a polygram. The function of polygraph practitioners, or polygraphists, is to study and interpret the markings on the polygram and make a determination as to whether the recorded physiological reactions evince the psychological and emotional pressures which normally accompany intentional attempts to deceive. It is clear, therefore that the polygraph does not detect lies, but merely records physiological phenomena which are assumed to be related to conscious deception."

■ Prior to the examination, the examiner becomes informed about the facts of the case. The actual polygraph examination begins with a pre-test interview between the examiner and the subject.[7] During the pre-test interview, the examiner, with the help of the subject, constructs the wording of the questions that are to be asked during the examination.[8] Generally, three types of questions are used in polygraph examinations: relevant questions, irrelevant or neutral questions, and control questions. The relevant questions concern the subject's guilt or innocence of the crime charged. Irrelevant questions are used at the beginning and end of the test

---

[7] *See* Reid and Inbau, Truth and Deception 11 (2nd ed 1977). We rely on numerous sources in this opinion which are essentially non-adjudicative. We take judicial notice of many legislative facts to decide whether the proffered evidence should be admitted. Taking judicial notice of legislative facts is not subject to the Oregon Evidence Code. However, the commentary to OEC 201(b) of the code reads in pertinent part:

"* * * While judges take judicial notice of 'propositions of generalized knowledge' in a variety of situations—for example, when they determine the validity and meaning of statutes, or formulate common law rules, or decide whether evidence should be admitted, or assess the sufficiency and effect of evidence— these operations are all essentially nonadjudicative in nature. When judicial notice is seen as a significant vehicle for progress in the law, these are the areas involved, particularly in developing fields of specialized knowledge."

[8] Simmons testified about the pre-test interview:

"* * * The pre-test has to be done correctly. The person has to be allowed to talk about the situation. You have to kind of get an idea of how emotional the person is in certain areas. Then, the questions have to be formulated right, the wrong questions can result in a bad test that obviously causes problems."

and relate to neutral topics such as date of birth, name and age. Control questions serve as a basis of comparison with the relevant questions. Control questions are questions about acts of wrongdoing of the same kind as the incident under investigation, and the one to which the subject, in all probability, will lie or to which his answer will be of questionable validity in his own mind. *See* Reid & Inbau, Truth and Deception 28 (2nd ed 1977). In addition to developing the questions for the examination, the pre-test interview is used by the examiner to gain the confidence of the subject, to motivate the latter to participate seriously in the examining procedure and to cause the subject to believe that the test will reveal a lie. The examiner does this by administering calibration and "stim" tests.[9]

After the pre-test interview, the actual examination takes place. The examiner asks all the previously prepared questions, both relevant and control. The physiological responses are recorded. The polygrapher repeats the process one or more times, changing the order of the questions.[10]

After the examination, the examiner conducts a post-test interview. During this interview, the results of the polygraph test are discussed with the subject. If the results indicate deception, an attempt is made to determine if other factors could be responsible for the result. If other factors were responsible, the questions are reworded and the test readministered. The subject is given the opportunity to compare his deceptive response on the "stim" test with the same response on the questions related to the crime under investigation. Abrams, A Polygraph Handbook for Attorneys 89-90 (1977).

---

[9] D.T. Lykken, A Tremor in the Blood 94 (1981), provides an example of a "stim" test:

"* * * The subject is asked to pick a number * * * from 1 to 7. That number is then recorded on a card or paper so that both the subject and examiner can see it. * * * [T]he subject is told to reply 'No' to each question of the form, 'Did you choose number X?' The subject is also told that the purpose of this procedure is to calibrate the polygraph, 'so that I can determine what your polygraph responses look like when you are lying and when you are telling the truth.' The ability of the procedure to inspire confidence in the subject depends upon this latter statement. * * *"

[10] The relevant questions are never the first or last question asked, because the first and last questions elicit a greater response than the other questions.

### 1. *The technique's general acceptance in the field.*

There are several different types of polygraphic examinations, each based on different assumptions and each possessed of different degrees of accuracy. If the question is asked, "Should the results of polygraph examinations be admissible as evidence?," the response should not be an answer, but another question: "What type of polygraphic examination produced the results?" Dr. David Thoreson Lykken, a Professor of Psychology and Psychiatry at the University of Minnesota Medical School, collects in his book, A Tremor in the Blood 149 (1981), the main types of polygraph examinations:

Relevant/Irrelevant (R/I)
(General Series Test)

Lie Control Test (LCT)

Zone of Comparison (ZOC)

Truth Control Test (TCT)

Positive Control Test (PCT)

Relevant Control Test (RCT)

Peak of Tension (POT)

Searching Peak of Tension Test (SPOT)

Lykken carefully evaluates each test in separate chapters in his book and then summarizes the tests by name, originator, subject of "control" questions and comments on validity. (See table on page 447.)

Although Lykken is critical of all polygraph tests and results, he recognizes that the positive control test, the relevant control test and the peak of tension test are widely used and are generally accepted techniques in the field of polygraphy. The relevant control test and the peak of tension test were utilized in this case. As previously mentioned, polygraph experts in this case found the relevant control test to be inconclusive. The defendant's central offer of proof was the result of the peak of tension test conducted by criminal defense polygraph examiner Simmons. The peak of tension test depends on the examiner having knowledge of details of the crime that the suspect should recognize only if he is guilty. In this case, specific information that reputedly was not made known to the defendant was communicated to the polygraph

examiner. This information apparently was gleaned from the police reports by polygrapher Simmons. Simmons testified on direct examination:

"* * * I used * * * the report that indicated [the] suspect had approached the victim and asked about a dog, made some mention about losing a poodle, that he couldn't find his poodle.

"So I asked him if he had any knowledge about what the girl had been asked about at that time and he said he didn't. So I asked a series of questions, do you know if Nancy [the victim] was asked about a tavern, do you know if Nancy was asked about a dog, do you know if Nancy was asked about a street.

"I explained to him one of those items was what the victim was asked about. The others were just made up by myself. And, he answered no to all the questions he didn't know. So I went through that test as I recall three times asking those specific questions at different places.

"Q. Did you then evaluate the score on that or go on to another test?

"A. I went through another test.

"Q. What was the next test?

"A. The next series was related in that I asked him what type of dog was she asked about because the reports indicated the victim had been asked about a poodle. So I asked did you ask Nancy about a terrier, did you ask Nancy about a collie, did you ask Nancy about a poodle, about a shepherd, about a doberman. I asked about those five questions.

"Q. And, again you went through that series a number of times?

"A. That I went through two times.

"Q. And, then the next series?

"A. The next series, the reports indicated that the suspect had told the victim that he was here on a Navy ship. He was in the Navy. I can't recall exactly the details on that, something about him being in the Navy. So I worked out a series of questions on that, did you tell Nancy you were in the Army, did you tell Nancy you were in the Navy, did you tell Nancy you were in the Air Force, did you tell Nancy you were in the Marines, did you tell Nancy you were in the Coast Guard, going now to all the questions.

"Q. And, how many times did you go through that series?

"A. I went through that twice.

"Q. And, did you go through the four series?

"A. Yes, four series, the suspect had told the victim that he was going to [meet] her the next day in a certain type of vehicle. He told the victim that he had two vehicles, one of the vehicles he said was a red Datsun pick-up. So I asked him a series of questions, did you tell Nancy he had a blue Volkswagon, green Camaro, black Firebird, did you tell Nancy you had a red [Datsun] pick-up, did you tell Nancy you had an orange van.

"And, I again went through that twice.

"Q. I understand you instructed him to answer no each time?

"A. I told him if he didn't know the answer he didn't know what the actual item was, to answer no to each of the questions.

"Q. Then, after you got your tracings, tell us what you did?

"A. Then, I went through to look at the responses to all the different tests to see if there was any response that stood out on any specific item in the test.

"As it turned out there were no specific responses to key items, to the items that were taken from the police reports.

"Q. Now, is that a pattern of response that is consistent with the absence of knowledge?

"A. Yes.

"Q. And, in your experience the test is reliable to the ninety-fifth percentile?

"A. That's again an estimate. I would say it's a fair estimate."

Reid and Inbau, in their book, Truth and Deception (2nd ed 1977), claim the peak of tension test persists as a reliable indicator of deception even after an intensive interrogation or after a full complement of control question tests. Therefore, they teach that it is advisable whenever circumstances permit to administer a peak of tension test even though the number of tests conducted at any one sitting may amount to more than five or six. *Id.* at 55.

So far as we can determine, the peak of tension test is taught in every modern school of polygraphy.[11]

## 2. *Qualification of experts.*

Polygraphers must be licensed by the State of Oregon and Oregon statutes regulate their qualifications. ORS 703.010 to 703.990 regulate all "persons who purport to be able to deduct deceptions and to verify the truth of statements through the use of instruments and mechanical devices, including but not limited to lie detectors, polygraphs and deceptographs."

ORS 703.090 provides that an applicant for a license as a general polygraph examiner must:

"(a) Be at least 18 years of age;

"(b) Be a citizen of the United States;

"* * * * *

"(e) Have received a baccalaureate degree from a college or university that is accredited by the American Association of Collegiate Registrars and Admissions Officers; or, in lieu thereof, be a graduate of an accredited high school and have at least five years of active investigative experience before the date of his application;

"(f) Have graduated from a polygraph examiners course approved by the board and have satisfactorily completed at least 200 examinations, or have worked as a polygraph examiner for a period of five years for a governmental agency within the State of Oregon and have completed 200 examinations; and

"(g) Have successfully completed an examination conducted by the board to determine his competency to act as a polygraph examiner."

ORS 703.060 describes the two types of polygraph examiner licenses: interns and generally licensed examiners. The public records of the Board on Police Standards and

---

[11] The peak of tension test was invented by Leonarde Keeler. Keeler's studies in polygraphy started in the 1920's when he was a high school student and had no professional psychological or scientific training. Nevertheless, he developed a portable polygraph instrument and joined the staff of the Scientific Crime Deduction Laboratory of the Northwestern School of Law in Chicago. Keeler has developed his own school of polygraphy. We will discuss the reliability and validity of the peak of tension test in our discussion of factor No. 4, the potential rate of error.

Training reveal that presently there are 16 interns and 35 licensed polygraphers in this state.

■ The fact that the State of Oregon requires basic qualifications for examiners does not guarantee the examiners' expertise at the time of trial. Professor Inbau, a co-author of the polygraph text, Truth and Deception" (2nd ed 1977), testified before a Congressional committee, that "only about 20 percent of the individuals who hold themselves out as examiners possess, in our opinion, the training and skill required for competency in the field."[12]

In this case, Dr. Stanley Abrams testified. His qualifications are set out in the introduction to his book, A Polygraph Handbook for Attorneys (1977):

"Stanley Abrams is a clinical psychologist in private practice and associated with the Permanente Clinic in Portland, Oregon. Polygraphy has been one of his areas of specialization and he has published a considerable number of papers in this area as well as several chapters in books. He has employed this procedure in a wide variety of criminal and civil cases and has testified for both prosecution and defense. His research findings have been presented before legal, psychological, and polygraph groups and he has served on various polygraph boards and has held office in the polygraph associations.

"Dr. Abrams received the B.A. degree in psychology from Wilkes College in Pennsylvania and the M.A. and Ph.D. in clinical psychology from Temple University He completed an internship at Temple University Medical School in 1960 and in 1971 took a course in polygraph at the Gormac School in Los Angeles."

■ Polygrapher Simmons, who also testified for the defense, is licensed by the State of Oregon and is a member of the American Polygraphy Association and the Northwestern Polygraphy Examiners Association, has practiced polygraphy for four years as an independent examiner doing mostly criminal defense work for private attorneys in criminal cases. He holds a Bachelor of Science degree in the Social Sciences from the Oregon College of Education and graduated from the Backster School of Lie Detection in San Diego, California,

---

[12] Inbau and Reid, *The Lie-Detector Technique: A Reliable and Valuable Investigative Aid*, 50 ABA J 470, 473 (1964).

after some 250 hours of specialized polygraphy training. He has conducted hundreds of polygraph examinations and passed a written test for polygraph technique. The trial court would be fully justified in reaching the conclusion that both Dr. Abrams and polygrapher Simmons were well-qualified as experts in their field.

### 3. *The use which has been made of the technique.*

The New York Civil Liberties Union conducted a study on polygraphs and employment. In an article entitled *Polygraphs and Employment: The Myth of Lie Detection,* NYCLU Privacy Project (June 1981), by Trudie Hayden, the author points out that up to 500,000 polygraph tests are administered nationally by employers as a pre-condition to employment. Although we do not know the numbers, it is common knowledge that police[13] and law enforcement agencies utilize polygraph examinations routinely in the investigation of criminal activity. Extensive use of polygraphy is not equivalent to general acceptance by the relevant scientific community as set forth in the *Frye* decision. Widespread use may have some bearing on probity, but is certainly not determinative.

### 4. *Potential rate of error.*

The accuracy of the polygraph has been the subject of numerous tests, set out *infra,* p 429. Accuracy can be broken down into two categories: reliability and validity. The reliability of a test is the consistency with which the test measures whatever it is that it measures. For example, if 100 people were given polygraph examinations five times, and in each test the same 85 people were found to be telling the truth, the test would be very reliable. The validity of the test is the extent to which the test measures that which it claims to measure. Using the same example from above, if only 30 of the 85 people who were found to be telling the truth actually were telling the

---

[13] Federal government polygraph use has more than tripled over the last 10 years, with about 23,000 examinations conducted in 1982. Office of Technical Information Report, Polygraph Magazine, Sept. 1983.

The public record of the Board on Police Standards and Training, *see* ORS 703.010, reveals that the Oregon State Police conducted 3,903 polygraph examinations from 1981 through 1983. This does not include tests conducted by city, county or federal law enforcement examiners.

truth, the test would not have a high degree of validity. A test can be very reliable but have a low degree of validity; on the other hand, a test that is unreliable cannot have a high degree of validity.

Determining the validity or reliability of polygraph examinations is difficult because the truth or falsity of the findings is rarely established subsequent to the examination. Dr. Abrams testified that in real life research the polygrapher does not have the opportunity to verify results in 40 percent of the cases. Furthermore, as Reid and Inbau point out:

> "A statistical determination of the accuracy of the Polygraph technique is practically impossible, just as it is in so many other fields involving the testing of human beings. For instance, the medical profession could hardly arrive at a statistically sound figure as to the accuracy of the diagnoses physicians make with respect to the physical ailments of patients. Not all of the mistakes of physicians are discovered, and there are many instances where the correctness of their diagnoses never becomes known to them. Yet we know that by and large their successes far outnumber their failures.

> "In many case investigations involving the use of the Polygraph technique, the truth or falsity of the examiner's findings is never factually established by subsequent events or disclosures. Proof is often lacking, therefore, as to whether the examiner in any given case was right or wrong. Nor can the accuracy of the Polygraph technique be determined in a psychology laboratory setting or by the use of fictitious crimes under other testing circumstances. This limitation prevails for the simple reason that it is practically impossible to simulate conditions comparable to those involved in actual case situations. The closest approach would be to have an examiner, or group of examiners, test a number of persons regarding an offense allegedly committed by one of them, without disclosing to the examiner the fact that *all* were innocent. But this would only determine accuracy with respect to innocent persons; it would not, and obviously could not, reveal anything whatsoever as regards accuracy in the testing of guilty persons." Reid and Inbau, *supra,* 303-04.

As previously mentioned, the term "accuracy of polygraphy" is ambiguous because in addition to the problems listed by Reid and Inbau, the researchers do not distinguish which type of polygraph test is being evaluated nor do they distinguish between reliability and validity. For instance, the

Police Polygraph Journal, 1980-81, reports a partial list of accuracy ratings of polygraph tests without reference to the type of test or the basis for the determination of accuracy:

| SOURCE | ACCURACY OF POLYGRAPH |
|---|---|
| Barland, Gordon H.<br>University of Utah | 89.7% |
| Bersh, Philip J.<br>Temple University<br>Study for the U.S. Army | 92.4% |
| Blum, Richard H. &<br>Osterloh, William<br>Stanford University | 96.2% |
| Edel, Eugene C. &<br>Jacoby, Jacob.<br>Study for U.S. Government | 95.0% |
| Horvath, Frank S. &<br>Reid, John E. | 87.8% |
| Lahri, S.K. &<br>Gaunguly, A.K.<br>Government of India | 90.0% |
| Podlesny, John A. &<br>Raskin, David C.<br>University of Utah | 94.0% |
| Raskin, David C. &<br>Hare, Robert H.<br>University of British Columbia | 96.0% |
| Slowik, Stanley &<br>Buckley, Joseph P. | 87.2% |
| Wicklander, D. &<br>Hunter, F. | 92.5% |
| Widack, Jan &<br>Horvath, Frank<br>Jagolian University<br>Poland | 95.0% |

Reid and Inbau claim "[t]he percentage of known errors with the technique used in the laboratories of John E. Reid and Associates is less than one percent." Reid and Inbau, *supra* at 304. Arther also claims 99 percent accuracy in "The Scientific Investigator" (1965). The record in *State ex rel Gerttula v. Hunnicutt, supra,* reveals that Dr. Stanley Abrams

testified that "when you break down the studies, it comes to roughly 98 percent accuracy."[14] Recent objective evaluation studies, done by simply evaluating charts without the person tested present, demonstrate accuracy ranging from 67.0 percent to 90.9 percent,[15] depending on the experience of the polygrapher.[16]

In addition to the problems with the studies examining the accuracy of the polygraph, the accuracy of the polygraph test itself is questionable. Subjects employ physical and psychological evasion tactics in an effort to "beat" the polygraph. They alter their breathing patterns by hyperventilating or taking heavy breaths when irrelevant questions are asked, flex, tense or contract muscles, bite on their tongue, and have been known to place a tack in their shoe and press down on it each time a question is asked. Lykken, *supra* at 238-39.

Some subjects attempt to evade detection by transferring their "thought processes from the relevant to the irrelevant questions or from the matter under investigation to some other one of [their] offenses or wrongdoings of a similar nature." Reid and Inbau, *supra* at 210-11. In the case of a psychopathic liar,[17] the subject's deceptions are entirely

---

[14] However, Abrams is criticized by Lykken, *supra* n 10, for tabulating a dozen studies spanning 56 years, some using the now often discarded relevant/irrelevant test, lie control test studies based on as few as 11 cases or as many as 175, studies using subjective clinical evaluations and others using independent chart evaluations, "and then Abrams simply averages the percent correct in each study."

[15] Hunter and Ash, *The Accuracy and Consistency of Polygraph Examiners' Diagnoses,* Vol 1, No. 3, J of Police Science and Administration 370 (1973).

[16] Abrams testified straight chart evaluation studies varied from 88 percent accuracy to a low of 63 percent.

[17] Psychiatrist Hervey Cleckley described a psychopathic liar thusly:

"The psychopath shows a remarkable disregard for truth and is to be trusted no more in his accounts of the past than in his promises for the future or his statement of present conditions. He gives the impression that he is incapable of ever attaining realistic comprehension of an attitude in other people which causes them to value truth and cherish truthfulness in themselves. Typically, he is at ease and unpretentious in making a serious promise or in (falsely) exculpating himself from accusations, whether grave or trivial. His simplest statement in such matters carries special powers of conviction. Overemphasis, obvious glibness, and other traditional signs of the clever liar do not usually show in his words or in his manner. Whether there is a reasonable chance for him to get away with the fraud

conscious and deliberate. "Research has shown that the genuine psychopath is less bothered than the normal person is about danger in general and punishment in particular. He is relatively untroubled by impending unpleasantness, whether of his own making or not." Lykken, *supra* at 229-30. Because of their lack of response, psychopaths may be better able than normal subjects to "beat" the polygraph.[18] There is little question but that there is a large population of psychopaths or, to use current terminology, persons with anti-social personalities,[19] involved in the criminal justice system. In contradistinction to the psychopathic liar, the extremely emotional and anxious truthful person runs the risk of registering a falsehood.[20]

The motivation of the subject also affects the accuracy of the polygraph results. The subject's concern about the seriousness of the offense charged, his attitude regarding the fallibility of the polygraph and his state of mind if he knows adverse test results will not be used in court against

---

or whether certain and easily foreseen detection is at hand, he is apparently unperturbed and does the same impressive job * * *. During the most solemn perjuries he has no difficulty at all in looking anyone tranquilly in the eyes." (Footnote omitted.) Cleckley, The Mask of Sanity 341 (5th ed 1976).

[18] Professor Robert Hare and Dr. Lykken conclude that this theory has yet to be disproven. Lykken, *supra* n 9 at 232-33.

[19] Diagnostic and Statistical Manual of Mental Disorders (Anti-social personality), DSM III, American Psychiatric Association (3rd ed 1981).

[20] Lykken, *supra* n 9 at 114, 126, gives the following example:

"* * * In Yakima County, Washington, where all women who report rape are required to take lie detector tests, 60% 'fail' the tests due to strong reactions to the relevant questions.[2]

---

"2. Lie Test for Rape Victims, *Mother Jones*, July 1979, p. 10. This practice is widespread in the U.S. Jan Leventer, codirector of the Women's Justice Center [WJC] in Detroit, determined in 1978 that rape victims were being subjected to polygraph tests in at least 17 states. The WJC brought suit to stop the practice in Detroit and, in January of 1979, the Detroit Police Department agreed to these demands. In Maryland, one of the 'relevant' questions routinely asked during lie tests of rape victims was, 'Did you have an orgasm?' "

him or if he knows he has previously "passed" a prior test,[21] may influence the physiological responses of the subject.

There are other factors[22] which potentially could affect the accuracy of the polygraph examination, including involvement in other similar acts or offenses, excessive interrogation prior to test, adrenal exhaustion, inadequate question phraseology, and physiological abnormalities due to the use of alcohol or other sedatives.[23] All of the above-listed evasive techniques may affect the accuracy of the polygraph. However, polygraphers may be able to compensate for that impact because the evasive conduct is significant and may manifest itself on the tracings of the polygraph.

Although Dr. Abrams has testified that polygraph testing is 98 percent accurate, he cited no studies directed specifically to the peak of tension test to back up this estimate. Lykken contends there is no validity assessment of the peak of tension test. However, Dr. Stanley Abrams, in his treatise, A Polygraph Handbook for Attorneys 72 (1977), states: "Lykken in dealing with this [peak of tension] technique on a

---

[21] A commentator has suggested it should be standard practice for the defense to obtain an "ex parte" polygraph examination before stipulating to the results of a polygraph examination:

> "If defense counsel seeks to enter a stipulation for the introduction of polygraph evidence, it is incumbent upon him to pretest the client with a polygrapher of counsel's own choosing. Failing to do this may amount to incompetence because counsel is necessarily ignorant of what the results of the test will be. Usually the issue upon which a test is given is dispositive of a case, and by stipulating to what may be the most crucial evidence against his client, defense counsel could be deemed to be withdrawing a crucial defense. To remedy this problem, a prestipulation private examination should be run on a defendant, and if the results are favorable, the stipulation may be entered with some degree of confidence that the results of the second test will not result in disaster." 43 ALR Fed 68, 77 (1979).

Defense counsel can shop for a friendly polygraph examiner, hire that examiner as a "consultant" under the attorney-client privilege, see OEC 503 and *Brink v. Multnomah County,* 224 Or 507, 356 P2d 536 (1960), and if the defendant flunks that examination, the prosecution normally never knows the results of the examination. Even if the prosecution knew of such an examination, the state could not offer any evidence or comment about the examination. On the other hand, if the defendant passes an ex parte polygraph examination, the defendant can take a subsequent examination geuinely believing that it cannot hurt him.

[22] *See* Reid and Inbau, Truth and Deception 194-257 (2nd ed 1977).

[23] In this case, defendant admitted that prior to the third polygraph he had smoked marijuana and consumed beer.

statistical basis indicated that with this approach the likelihood of determining guilty knowledge is extremely high." D.T. Lykken, *Psychology and the Lie Detector Industry,* Amer. Pscyhologist 29 (1974).

An article in *Polygraph* magazine[24] reports that a witness from the Office of Technology Assessment for Congress testified that an "overall measure of validity [of polygraph examinations] is not possible." After an exhaustive review of the literature in the field, that governmental agency official concluded: "Central to legal, legislative and scientific assessments of polygraph tests are their validity. Yet, despite many decades of judicial, legislative and scientific discussion, no consensus has emerged about the accuracy of polygraph tests." *Id.* at 238.

We conclude no judgment of polygraph testing's validity or potential rate of error can be established based on available scientific evidence. The polygraph test is, in reality, a very complex process that involves much more than the instrument or the polygram. Although the instrument is essentially the same for all applications, the types of individuals tested, the training of the examiner, the purpose of the test, the type of test utilized, the questions asked, among many other factors, can differ substantially. In spite of all these variables in polygraph testing, the polygraph experts persist in telling the trier of fact, as they did in this case, that polygraph tests are virtually infallible.[25]

*5. The existence of specialized literature.*

Over one thousand articles have been written on the subject of polygraphy. Much of the literature is written by polygraphers wishing to advance the technology in their chosen field. Reid, Inbau, Dr. Stanley Abrams and F. Lee Bailey are among those who lead the supporters, while Dr. David Lykken is a noted critic of polygraphy. In any event, there is no dearth of literature available on this controversial subject. Some of the articles are written by scientists, some by lawyers, some by law enforcement personnel, and some by

---

[24] *Polygraph* monthly magazine (Sept 1983).

[25] In saying this in respect to the admissibility of polygraph evidence in a court of law, we do not discount the important role polygraphy plays as an investigative aid in criminal cases or otherwise.

polygraphers. The articles are pro and con with respect to the polygraph's use in society, its validity and its admissibility in courts. The availability of this mass of literature may or may not be relevant in any given case.

### 6. *The novelty of the invention.*

Webster's Dictionary defines "novelty" as something "new or unusual." There is nothing especially "new" about the polygraph instrument, the polygram, or the various tests or existence of qualified examiners. The first attempt to utilize a scientific instrument in an effort to detect deception occurred about 1895. In that year, Cesare Lombroso used a blood pressure device for the purpose of detecting lies. He conducted some rudimentary experiments in the field of detecting deception. In 1915, William Moulton Marston, a lawyer and Ph.D. from Harvard University, developed a polygraph instrument which consisted essentially of the instrument commonly used by physicians in determining a patient's blood pressure. He also recorded respiration and experimented with the galvanometer to record skin resistance changes.[26]

Reid and Inbau report that:

"* * * [In 1921], John A. Larson * * * constructed an instrument capable of continuously recording all three phenomena—blood pressure, pulse, and respiration—during the entire period of the test. With his instrument Larson conducted a number of tests on criminal suspects and reported a high percentage of accuracy in his results.

---

[26] Dr. Lykken, *supra* n 9 at 27-28, is very critical of Marston:

"Marston not only invented modern lie detection but was among the first to appreciate its commercial possibilities. An article in *Look Magazine* described his use of the polygraph in marital counseling; a wife's reaction to her husband's kiss is compared with her response to the kiss of an attractive stranger. Marston and his machine appeared in full-page ads for razor blades. Finally hitting upon the ideal outlet for his fertile imagination, Marston—under the nom de plume 'Charles Moulton'—created the comic strip character Wonder Woman.

"Because of his extravagant claims and uninhibited conduct, Marston was repudiated by serious students of polygraphic interrogation. In a scathing review of his 1938 book, Professor Fred Inbau concluded, 'It can only bring ridicule upon the subject matter and disrespect for its author.' Nonetheless, Marston might be called the grandfather ('foxy grandpa?') of polygraphy because of the early reports of his work, published prior to 1921, and their impact on Chief August Vollmer of the Berkeley, California, police department and especially upon one of Vollmer's police officers, John A. Larson."

"In 1926 Leonarde Keeler constructed a more satisfactory instrument than the one used by Larson. Later on Keeler made additional changes in the instrument, and at the time of his death in 1949 the 'Keeler Polygraph' included, in addition to units for recording blood pressure-pulse and respiration changes, a galvanometer for recording what is known as the galvanic skin reflex or electrodermal response (generally referred to as the GSR).

"Keeler is also to be credited with introducing the card test (which he used for 'control' purposes), and the specialized peak of tension test * * *.

"* * * Reid found that by various forms of unobservable muscular activity, a subject's blood pressure could be changed in such a manner as to affect seriously the accuracy of the examiner's diagnosis. He then devised an instrument (the 'Reid Polygraph') for recording muscular activity along with changes in blood pressure, pulse, respiration, and GSR.

"In 1947 Reid introduced a completely revised Polygraph technique, the most significant feature of which was the utilization of a 'control question.' It is the basic response indicator that is the core of what has become known as the 'Reid control question technique.' * * *" Reid and Inbau, *supra* at 3.

Other experts who became prominent in the field include Arther and Backster. Arther became the Director of the National Training Center for Polygraph Science in New York, and Backster founded the Backster School of Lie Detection in San Diego, California, which was attended by polygrapher Simmons. The Gormac Polygraphy School of Arcadia, California, which was attended by the other two polygraphers involved in this case, is another recognized school of polygraphy.

Marston's crude pioneering instrument has been replaced by sophisticated computerized instruments manufactured by such firms as Stoelting and Lafayette. Dr. Abrams uses the Lafayette and, in this case, Simmons and Bell used the Stoelting. There is little difference in the instruments themselves. *See* Abrams, A Polygraph Handbook for Attorneys 54-60 (1977).

If polygraphy dates back some 90 years and the instruments are not novel, what causes polygraph evidence to be considered "novel scientific evidence"? The novelty of

polygraphy arises because it is the only scientific evidence utilizing instrumentation that attempts to convey to a jury whether a witness has been deceptive or truthful. In that sense, polygraphy is truly novel and unique. With rare exceptions, for example, *United States v. Ridling,* 350 F Supp 90 (ED Mich 1972); *United States v. Zeiger,* 350 F Supp 685 (DC DC 1972); *State v. Dorsey,* 88 NM 184, 539 P2d 204 (1975); *State v. Sims,* 52 Ohio Misc 31, 369 NE2d 24 (CD 1977), state and federal courts in this country have rejected the admissibility of such evidence in our trial courts.

 *7. The extent to which the technique relies on the subjective interpretation of the expert.*

 The final factor which may be considered is the extent to which the technique relies on the subjective interpretation of the expert. Authorities agree that the accuracy of polygraph evidence depends upon the expertise of the examiner.[27]

 Reid places great importance on observing and noting a subject's behavior during the pre-test interview, the actual test and the post-test interview. In 1953, he and Arther developed a list of "behavior symptoms" which purportedly discriminated between lying and truthful subjects during a polygraph examination. According to this study, if the subject appears nervous, resentful, aggressive, appears to be in a shocked condition, exhibits "mental blocks," has a dry mouth or a gurgling stomach, refuses eye contact, moves restlessly, appears "overly friendly or polite," describes himself as religious, complains of pain from the blood pressure cuff,

---

[27] *See,* Lykken, *supra* n 9 at 89-93; Reid and Inbau, *supra* n 22 at 304-05. Reid and Inbau state the following:

 "Basic to all that has been said with regard to the utility and accuracy of the Polygraph technique is the matter of examiner qualifications.

 "An examiner must be an intelligent person, with a reasonably good educational background—preferably a college degree. He should have an intense interest in the work itself, a good practical understanding of human nature, and suitable personality traits which may be evident from his otherwise general ability to 'get along' with people and to be well liked by his friends and associates. No amount of training or experience will overcome the lack of these necessary qualifications.

 "Many persons now functioning as Polygraph examiners do not possess these basic qualifications. They should never have been encouraged to embark upon such a career. * * *"

being eager to finish the examination and leaves promptly—all these are behavior symptoms of the liar. However, if the subject appears confident, eager to undertake the examination, sincere and straightforward, the subject is exhibiting symptoms of truthfulness.[28]

Polygraph test results may be altered by the examiner's preconceptions as to factual elements of the case or the guilt or innocence of the subject. If the examiner has an accusatory tone of voice, rather than a neutral tone when asking the questions, the subject's response may be altered. If the examiner is biased as to the subject's guilt or innocence, the questions may be framed differently. Furthermore, any preconceptions or biases are likely to influence the examiner's final interpretation of the polygraph charts.[29]

The results of the test depend on the training and experience of the examiner. In addition to operating the polygraph mechanically, the examiner needs to know how to conduct a pre-test interview. The examiner must be able to frame appropriate questions, read and interpret the polygraph charts, detect indications of use of depressant drugs and analyze the subject's behavior symptoms. A study conducted by Horvath and Reid[30] to determine if polygraphers were able

---

[28] Reid and Inbau conclude that if the polygraph records clearly indicate deception, they should be given preference over contrary behavior symptoms. Reid and Inbau, *supra* n 23 at 193. This study also includes a third list of "Behavior Common to both Liars and Truthtellers." Reid and Inbau, *supra* n 23 at 294.

[29] Dr. Martin T. Orne, one of the leading psycho-physiologists doing polygraph research, testified in *United States v. Urquidez,* 356 F Supp 1363, 1365 (DC CD Cal 1973), as follows:

"* * * [T]he very charts themselves are likely to be affected by the beliefs of the polygraph man as he is testing them, so that I cannot believe that you test someone exactly the same way if you have a very high belief in his guilt than if you have a very high belief of his innocence * * *. [N]o one has ever separated the effects of the conviction of the polygrapher from the kind of charts he gets. There is good reason to believe that the physiology that people will show is going to be affected by the way they are tested."

[30] The study was designed to determine if professional polygraphers were accurate and consistent in their judgments of real-life cases of known truth and deception responses. The examiners were forced to base their opinions on the polygraph charts alone. The test results showed an average accuracy of 87.75 percent in correctly identifying the truthful and the deceptive subjects. Horvath and Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception,* J Crim L C & P S, 276-376 (1971).

*See also* Hunter and Ash, *supra* n 15.

to diagnose deception solely from analysis of polygraph records indicated that an inexperienced examiner (one with less than six months' experience) had the poorest consistency (79.1 percent) and the most experienced examiner had the best consistency (91.4 percent) of all examiners in the study.

The nature of the polygraph examination is closer to a psychiatric evaluation than to objective scientific analysis such as fingerprints and ballistics. The polygraph technique is heavily dependent on the subjective evaluation of the expert both in the administration of the test and in reaching the result.

After evaluating these seven factors, we conclude that under proper conditions polygraph evidence may possess some probative value and may, in some cases, be helpful to the trier of fact. We now, therefore, evaluate the probative value of such evidence against its prejudicial effect.

## SHOULD POLYGRAPH EVIDENCE BE EXCLUDED UNDER OEC 403?

In this opinion, as mentioned, we have accepted the invitation of the Legislative Assembly to adopt a "standard to be used in determining the admissibility of scientific evidence," *see* Commentary, Oregon Evidence Code 702. In doing so, this court has rejected the *Frye* standard of "general acceptance in the scientific community" as an unnecessarily rigid concept and has made "general acceptance" one of seven factors to be considered in determining the relevancy of scientific evidence. We also have rejected the *Kersting* "reasonably reliable" test as too simplistic but retain aspects of it to be considered in an overview of probativeness of scientific evidence. We have set forth seven factors to be used in connection with the definition of "relevancy" as defined in OEC 401 and to be utilized in determining the helpfulness test for expert testimony expressed in OEC 702. Having evaluated these seven factors in connection with OEC 401 and OEC 702, and finding that polygraph evidence may possess some relevancy, we now turn to the issue whether such evidence, if relevant, should be excluded under OEC 403, which emphasizes that although evidence may be probative the inquiry does not stop there. The evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay or needless presentation of cumulative evidence.

 This rule requires trial courts and, in some cases, appellate courts to evaluate the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment. *See* 3 Weinstein's, *supra* at 702-19. The trial judge in the present case noted:

> "I believe the reason why [polygraph evidence is not admissible] is a concern about the misuse by the jury that the evidence [will be] overvalued by the trier of fact."

After careful evaluation of this issue he excluded the evidence, commenting:

> "* * * I believe the existing Oregon Supreme Court decisions require * * * the results of polygraph evidence, which has been offered in evidence and the record has been made, are not admissible and it's because I believe no matter how you phrase it, it's because of the misuse of the evidence, potential misuse of the evidence, overvaluing of [the] accuracy that has been one of the concerns."

Judge Unis's evaluation of the reasons for excluding polygraph evidence has been stated by many courts and many writers. We said as much in *State v. Green, supra,* 271 Or at 169:

> "* * * [I]t is our opinion that the danger of prejudice from the impact of such evidence [polygraph] upon the question of the credibility of a defendant is so great as to ordinarily outweigh the probative value of such evidence * * *."

The Colorado Supreme Court concluded in *People v. Anderson,* 637 P2d 354, 361 (Colo 1981):

> "The admission of polygraph evidence at trial is also unwarranted because of the serious interference with and potential prejudice to a jury's evaluation of the demeanor and credibility of witnesses and their testimony. * * * [W]e are acutely aware that the polygraph is unlike other scientific evidence since what it attempts to measure — the truthfulness of a witness or defendant — is so directly related to the essence of the trial process.
>
> "* * * Apart from the doubts raised about reliability and competence, * * * there is an inherent danger that a jury will

rely too heavily on the results of a polygraph test. Because of its aura of scientific infallibility, we believe that jurors are likely to give significant, if not conclusive weight to a polygrapher's opinion * * *. [T]he jurors' traditional responsibility to collectively ascertain the facts to determine whether guilt has been proven would be prejudiced by the admission of polygraph evidence."

As was said in *United States v. Addison,* 498 F2d 741, 744 (DC Cir 1974), the scientific evidence must not "assume a posture of mystic infallibility in the eyes of a jury of lay[persons]." This view is shared by many other courts. *See, State v. Catanese,* 368 So 2d 975 (La 1979); *United States v. Alexander,* 526 F2d 161 (8th Cir 1975); *People v. Barbara,* 400 Mich 352, 255 NW2d 171 (1977).[31] A Committee on Polygraphy of the New Jersey Supreme Court concluded that jurors would consider polygraph evidence as being infallible. Garvey, Polygraph (2) 116-21 (1973).

Polygraph evidence may well divert the trier of fact from the direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence. Polygraph evidence is not just another form of scientific evidence presented by experts such as ballistics analysis, fingerprint and handwriting comparisons, blood typing and neutron activation analysis.[32] These other tests do not purport to indicate with any degree of certainty that the witness was or was not credible. By its very nature the polygraph purports to

---

[31] *See also State v. McNeil,* 46 NC App 533, 265 SE2d 416, 419 (1980) ("We believe the jury is still the better forum, when presented with the facts, to determine guilt or innocence."); *People v. Monigan,* 72 Ill App 3d 87, 28 Ill Dec 395, 390 NE2d 562, 563 (1979) ("The admission of the polygraph test has such an impact on the jury that the truth seeking function of the trial will be destroyed."); *People v. Davis,* 343 Mich 348, 72 NW2d 269 (1955); *People v. Sinclair,* 21 Mich App 255, 175 NW2d 893 1970); *Henderson v. State,* 230 P2d 495 (Crim Ct of App Okla 1951).

Many writers have commented on this problem of overvaluation of polygraph evidence by the trier of fact. *See,* Abbel, *Polygraph Evidence: The Case Against Admissibility in Federal Trials,* 15 Amer Crim L Rev 29, 53 (1977) ("[T]he use of the polygraph machine lends an illusory aura of objectivity and accuracy which is likely to mislead jurors into giving undue weight to polygraph examinations'); Highleyman, *The Deceptive Certainty of the Lie Detector,* 10 Hastings L J 47 (1958); Kaplan, *The Lie Detector: An Analysis of its Place in the Law of Evidence,* 10 Wayne L Rev 381, 386 (1964); Raddeck, *The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo,* 3 Loyola U L J (Chic) 289, 300-02 (1972).

[32] For many other examples of scientific evidence, *see* Inwinkelried, *A New Era in the Evolution of Scientific Evidence—A Primer on Evaluating the Weight of Scientific Evidence,* 23 Wm & Mary L Rev 261 (1981).

measure truthfulness and deception, the very essence of the jury's role. *See, United States v. Alexander, supra,* 526 F2d at 169.

In addition to the potential misuse and overvaluation of the polygraph evidence, we are also concerned about the undue delay in administering justice that would occur if we were to allow admission of polygraph evidence in all cases. As previously noted, there are currently only 35 licensed polygraphers in this state who might be available to conduct testing of witnesses for trials in Oregon. In 1983, our circuit courts terminated 83,966 cases and our district courts terminated 457,632 cases. Of course, not all these cases would warrant polygraph testing of witnesses. Nevertheless, a substantial number of cases, whether tried or not, would involve the "lie detector" testing of potential witnesses. All this administrative burden could cause "undue delay" as set forth in OEC 403.

Furthermore, as well as disrupting the lives of many witnesses (which in some cases have already been burdened with interrogation by police officers, defense investigators, grand jury proceedings, preliminary hearings, pretrial motion testimony and trial testimony), the introduction of polygraph evidence at trial could result in a time-consuming and confusing battle of polygraph experts. In *Commonwealth v. Fatalo,* 346 Mass 266, 191 NE2d 479 (1963), the Supreme Court of Massachusetts upheld the trial court's rejection of all evidence concerning a polygraph test. In referring to an offer of proof by the defendant, which the prosecution opposed, the opinion stated:

> "It is precisely this sort of controversy which creates the danger that on the introduction of such evidence a trial could descend into a battle of experts on the probative value of the polygraph test rather than a determination of the guilt or innocence of a defendant. The end result, in all likelihood, would be confusion instead of enlightenment." 191 NE2d at 480-81.

In *United States v. Urquidez,* 356 F Supp 1363 (DC CD Cal 1973), the federal trial judge wrote:

> "* * * The most obvious conclusion that resulted from the three days of testimony [about polygraph evidence] is that there are many variables, other than the ultimate question of

truth or falsity, that can influence the results of a polygraph test. There are also many areas in which 'experts' can disagree as to the appropriateness of the way in which the test is given and as to how the results should be interpreted." 356 F Supp at 1365.

He continued:

"* * * [A]lthough the inquiry was far from complete, the experience of this case has amply shown that, as of now, the validity of a polygraphic test is dependent upon a large number of variable factors, many of which would be very difficult, and perhaps impossible, to assess. In a given case, *the time required in order to explore and seek to adjudge such factors would be virtually incalculable* (we did little more than make a beginning in the present case). Accordingly, this court is impelled to the conclusion that the administration of justice simply cannot tolerate the burden of litigation inherently involved in such a process." *Id.* at 1367. (Emphasis added.)

Although not in any sense determinative, these concerns are relevant to the issue whether evidence of questionable value is outweighed by "consideration of undue delay" as set forth in OEC 403.

■ Oregon Evidence Code Rule 403 codifies the common-law discretionary power of the trial judge in balancing probative value of evidence against its prejudicial effect. But, this so-called "balancing" rule does not always call for the exercise of discretion by the trial court. Notwithstanding the usual deference to trial court discretion, we as an appellate court retain our role to determine the admissibility of scientific evidence under the Oregon Evidence Code. After carefully evaluating evidence and arguments for and against the introduction of polygraph evidence within the context of OEC 401, 702 and 403, we conclude that the probative value of polygraph evidence is far outweighed by reasons for its exclusion.

## OTHER GROUNDS FOR EXCLUSION OF POLYGRAPH EVIDENCE

We find no rule or provision in our evidence code or any Oregon evidentiary decision by this court allowing for any witness, lay or expert, whether utilizing scientific equipment or not, to pass upon the credibility of a trial witness. Although

OEC 608[33] provides that the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, that evidence may refer only to *character* for truthfulness or untruthfulness. A polygrapher's opinion based on a polygraph examination that a witness was truthful would not qualify under OEC 608(1)(b) because the polygrapher would not have general personal knowledge about the witness's veracity. OEC 608(1)(b) allows persons familiar with the reputation of a witness to testify in opinion form as to the witness's general truthfulness or untruthfulness. This new rule allowing opinion testimony as to the general veracity of witnesses departs from the common-law restriction that a witness may only testify in the form of general reputation for veracity traits. It has no application to the admissibility of polygraph evidence.

■ OEC 608(2) expressly prohibits the admission of evidence of specific instances of conduct of a witness for the purpose of attacking or supporting the credibility of the witness. If, as in this case, a witness has passed a polygraph examination, the polygraph result constitutes a specific instance of conduct of the witness being offered for the purpose of supporting the credibility of the witness. Such extrinsic evidence is inadmissible under OEC 608(2).

■ OEC 608 complements and supports the long-standing position of this court that no witness may pass upon the credibility of another witness in respect to specific conduct. In excluding psychiatric testimony as to the truthfulness of witnesses, we said in *State v. Walgraeve*, 243 Or 328, 333, 412 P2d 23, 413 P2d 609 (1966):

---

[33] OEC 608 provides:

"(1) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but:

"(a) The evidence may refer only to character for truthfulness or untruthfulness; and

"(b) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(2) Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

"The use of psychiatric testimony in the manner urged by the defendant would create a class of cases in which opinion evidence would, in fact, determine the credibility of witnesses. Unless the function of the jury is to find the truth, its role is devoid of substance. Often the jury can meet this obligation only by determining the credibility of witnesses. The jury system with all its imperfections, has served society well. It has not been demonstrated that the art of psychiatry has yet developed into a science so exact as to warrant such a basic intrusion into the jury process."

This rule was not changed by our recent decision in *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983):

"* * * We expressly hold that in Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. We reject testimony from a witness about the credibility of another witness, although we recognize some jurisdictions accept it."

We certainly agree with Judge Irving Kaufman's eloquent statement supporting this position in excluding polygraph in *United States v. Stromberg*, 179 F Supp 278 (SD NY), *reversed in part on other grounds* 268 F2d 256 (2nd Cir 1959):

"* * * The most important function served by a jury is in bringing its accumulated experience to bear upon witnesses testifying before it, in order to distinguish truth from falsity. Such a process is of enormous complexity, and involves an almost infinite number of variable factors. It is the basic premise of the jury system that twelve men and women can harmonize those variables and decide, with the aid of examination and cross-examination, the truthfulness of a witness. * * * I am not prepared to rule that the jury system is yet outmoded. I still prefer the collective judgment of twelve men and women who have sat through * * * a trial and heard all the evidence on the guilt or innocence of a defendant." 179 F Supp at 280.

Although other traditional evidentiary grounds for exclusion of polygraph evidence may exist in any given case,[34] we find discussion of such issues unnecessary here.

---

[34] Another basic evidence question as to the admissibility of polygraph evidence arises under OEC 801, that is, the hearsay nature of the responses by the witness to the polygrapher. This issue is not presented in this case. The responses here called only for the witness's *knowledge* of certain facts and were not offered to prove the truth of the matter contained in the answers. *See, Bridges v. State*, 19 NW2d 529 (Wis 1945). Whereas, in contrast, *State ex rel Gerttula v. Hunnicutt*, 297 Or 448, 687 P2d 777

## CONCLUSION

After analyzing the admissibility of polygraph evidence under the Oregon Evidence Code and existing caselaw, we conclude that upon proper objection polygraph evidence[35] shall not be admissible in any civil or criminal trial in this state[36] or any other legal proceeding subject to the rules of evidence under our Oregon Evidence Code.[37]

The Court of Appeals is affirmed.

---

(1984), presents a serious hearsay problem concerning the out-of-court responses to the polygrapher's questions. The statements in *Gerttula* were offered to prove the truth of the out-of-court statements by the accused.

[35] We refer to unstipulated polygraph evidence. The defendant contends that if polygraph evidence is not generally admissible, it should not be admissible even by stipulation. The Oregon Court of Appeals in *State v. Bennett,* 17 Or App 197, 521 P2d 31 (1974), upheld the admissibility of polygraph evidence pursuant to a stipulation. This court has not heretofore passed on that question.

The leading case on stipulations for the admission of polygraph evidence is *State v. Valdez,* 91 Ariz 274, 371 P2d 894 (1962). Admission by stipulation is now permitted in many federal and state jurisdictions. *See, e.g., United States v. Oliver,* 525 F2d 731 (8th Cir 1975), *cert den* 424 US 973 (1976); *Corbett v. State,* 584 P2d 704 (Nev 1978); *Robinson v. Wilson,* 44 Cal App 3d 92, 118 Cal Rptr 569 (1974); *State v. Lassley,* 218 Kan 758, 545 P2d 383 (1976); *State v. Ghan,* 558 SW2d 304 (Mo App 1977); *State v. Towns,* 35 Ohio App 2d 237, 301 NE2d 700 (1978); *State v. Ross,* 7 Wash App 62, 497 P2d 1343 (1972); *Cullin v. State,* 565 P2d 445 (Wyo 1977); *State v. McDavitt,* 62 NJ 36, 297 A2d 849, 855 (1972). *See also* Note, *The Polygraphic Technique: A Selective Analysis,* 20 Drake L Rev 330, 340 (19—); Note, *The Admissibility of Polygraph Evidence Pursuant to Stipulation in Criminal Proceedings,* 5 Akron L Rev 235 (1972).

Other states have continued to exclude polygraph evidence even upon stipulation. *See, e.g., Pulakis v. State,* 476 P2d 474 (Alaska 1970); *State v. Corbin,* 285 So 2d 234 (La 1973); *People v. Liddell,* 63 Mich App 491, 234 NW2d 669 (1975); *Fulton v. State,* 541 P2d 871 (Okl Cr 1975); *Lewis v. State,* 500 SW2d 167 (Tex Cr App 1973); *Romero v. State,* 493 SW2d 206, 211 (Tex Crim App 1973); *Commonwealth v. Pfender,* 280 Pa Super 417, 421 A2d 791 (1980); *State v. Dean,* 103 Wis 2d 228, 307 NW2d 628 (1981).

[36] The court has recently excluded reference to polygraph evidence offered to rehabilitate witnesses in criminal cases. *State v. Foster,* 296 Or 174, 674 P2d 587 (1983); *State v. Snider,* 296 Or 168, 674 P2d 585 (1983); *State v. Eby,* 296 Or 63, 673 P2d 522 (1983); *State v. Middleton,* 295 Or 485, 668 P2d 371 (1983).

[37] OEC 101, Applicability of Oregon Evidence Code, provides:

"(1) Courts. The Oregon Evidence Code applies to all courts in this state except for:

"(a) The small claims division of the Oregon Tax Court as provided by ORS 305.545;

"(b) The small claims division of a district court as provided by ORS 46.415; and

"(c) The small claims department of a justice's court as provided by ORS 55.080.

"(2) Proceedings generally. The Oregon Evidence Code applies generally to civil actions, suits and proceedings, criminal actions and proceedings and to contempt proceedings except those in which the court may act summarily.

"(3) Rules of privilege. Rules 503 to 514 relating to privileges apply at all stages of all actions, suits and proceedings.

"(4) Rules inapplicable. Rules 100 to 412 and Rules 601 to 1008 do not apply in the following situations:

"(a) The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.

"(b) Proceedings before grand juries, except as required by ORS 132.320.

"(c) Proceedings for extradition, except as required by ORS 133.743 to 133.857.

"(d) Sentencing, except as required by ORS 137.090.

"(e) Proceedings to revoke probation, except as required by ORS 137.090.

"(f) Issuance of warrants of arrest, bench warrants or search warrants.

"(g) Proceedings under ORS chapter 135 relating to conditional release, security release, release on personal recognizance, or preliminary hearings, subject to ORS 135.173.

"(h) Proceedings to determine proper disposition of a child in accordance with ORS 419.500(2).

"(i) Proceedings under ORS 484.445 to 484.480 to determine whether a driving while under the influence of intoxicants diversion agreement should be allowed or terminated."

TABLE 12–1. The main types of polygraphic lie tests. Unless the test conclusion is based solely on objective scoring of the polygraph charts, any of these methods degenerates to a clinical interview, its validity determined by the intuitive skills of the examiner. Typical "human lie detectors" seem to be wrong about 25% of the time.

| Name of Test | Originator | Subject of "Control" Questions | Comment |
|---|---|---|---|
| Relevant/Irrelevant (R/I) (General Series Test) | Larson | Irrelevant, innocuous matters. | The earliest method, yields many false-positives. |
| Lie Control Test (LCT) | Reid | Past misdeeds similar to but less serious than crime in question; answers assumed lies. | Standard method for specific-issue work. Only method tested for validity; 64%-72% average, half of truthful subjects fail. |
| Zone of Comparison (ZOC) | Backster | Same as LCT. | Variant of LCT; similar assumptions, equivalent validity. |
| Truth Control Test (TCT) | Reid | Fictitious crime; subject led to think he is equally suspect, equally at risk. | Seldom used, never tested for validity. Requires elaborate deception of suspect. |
| Positive Control Test (PCT) | Reali | Subject required to answer each question with a lie, then truth; lie is the control. | No validity data. Assumes that forced "lie" as arousing as real lie, forced truth equivalent to volunteered truth. |
| Relevant Control Test (RCT) | (evolved) | Only relevant questions; serve as controls for each other. | Standard employee screening test. Widely used; no validity data. |
| Peak of Tension (POT) | Keeler | Like a multiple-choice item; incorrect alternatives are the controls. | Only examiner and guilty subject know correct alternative. Several POT items yield a Guilty Knowledge Test. No validity data. |
| Searching Peak of Tension Test (SPOT) | Keeler | As above but examiner does not know correct alternative. | Useful only if indications can be confirmed; a search procedure rather than a test. |